Brian Grimm v. State of Maryland, No. 37, September Term, 2017

**FOURTH AMENDMENT – PROBABLE CAUSE – DETERMINATION OF DRUG DETECTION DOG'S RELIABILITY – STANDARD OF REVIEW –** Court of Appeals held that ultimate question of probable cause to conduct warrantless search of vehicle based on drug detection dog's alert is reviewed *de novo*; *i.e.*, standard of review as to issue of probable cause to search based on drug detection dog's alert is *de novo*. Determination of probable cause involves two-step process. First, court must identify all relevant historical facts that were known to officer at time of search and, if necessary, any relevant or disputed background facts. Second, court must determine whether those facts give rise to probable cause to search. Issue of drug detection dog's reliability is factual question; accordingly, appellate court reviews for clear error trial court's determination as to whether drug detection dog is, or is not, reliable. Upon determination of reliability, court must determine whether drug detection dog's reliability and any other relevant circumstances, viewed from standpoint of objectively reasonable officer, give rise to probable cause. Court held that trial court did not clearly err in determining that drug detection dog was reliable, as abundance of evidence supported trial court's determination as to reliability, and, under totality of circumstances, probable cause existed.

Circuit Court for Anne Arundel County
Case No. 02-K-14-001188

Argued: February 1, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 37

September Term, 2017
_____

BRIAN GRIMM

v.

STATE OF MARYLAND
_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.
_____

Opinion by Watts, J.
Adkins, J., concurs.
_____

Filed: April 20, 2018

It is undisputed that the ultimate question of probable cause to conduct a warrantless search is reviewed by an appellate court *de novo*; *i.e.*, the standard of review for the issue of probable cause is *de novo*, or without deference. "In reviewing a trial court's ruling on a motion to suppress, an appellate court reviews for clear error the trial court's findings of fact, and reviews without deference the trial court's application of the law to its findings of fact." Varriale v. State, 444 Md. 400, 410, 119 A.3d 824, 830 (2015) (citation omitted). It may be less clear, however, whether a particular determination by a trial court is a finding of fact, and thus subject to deference, or a conclusion of law, and thus subject to no deference. See Miller v. Fenton, 474 U.S. 104, 113 (1985) ("[T]he appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive." (Citations omitted)).

This case requires us to determine whether, in the context of a probable cause determination, the issue of a drug detection dog's reliability is a factual question to be reviewed for clear error, or a legal one to be reviewed *de novo*. This is a matter of first impression, and our resolution of the issue will govern the standard of review of a trial court's determination as to whether a drug detection dog is, or is not, reliable.

We set the stage. In this case, Sergeant Christopher Lamb of the Maryland Transportation Authority Police initiated a traffic stop of a vehicle that Brian Grimm, Petitioner, had been driving. Officer Carl Keightley of the Maryland Transportation Authority Police, a K-9 handler, and Ace, his Belgian Malinois K-9 partner, arrived at the

scene of the traffic stop.[1]  Ace scanned the vehicle and alerted to it.  Sergeant Lamb searched the vehicle and found drugs inside.

In the Circuit Court for Anne Arundel County, the State, Respondent, charged Grimm with various drug-related crimes.  Grimm moved to suppress the drugs, alleging that Sergeant Lamb lacked probable cause to search his vehicle.  At a hearing on the motion to suppress, the circuit court admitted into evidence several documents, including Ace's training records, Ace's field reports,[2] and Officer Keightley's and Ace's certifications.  The State called two expert witnesses: Officer Keightley and Sergeant Mary Davis, the Montgomery County Police Department's K-9 Unit's head trainer.  Grimm also called two expert witnesses: Ted Cox, the former head trainer of the Baltimore Police Department's K-9 Unit and the Maryland Transportation Authority Police's K-9 Unit,[3] and Officer Michael McNerney, a trainer of the Maryland Transportation Authority Police's K-9 Unit.  Sergeant Davis essentially testified that Ace was reliable, while Cox and Officer McNerney opined that Ace was unreliable.  The circuit court denied the motion to suppress, concluding that Sergeant Lamb had probable cause to search the vehicle.  The circuit court found that Sergeant Davis was "the most credible witness[,]" and "accept[ed]" her opinion as to Ace's reliability.

---

[1] "[T]he Belgian Malinois is an alert, high-energy breed, popular as both a police and military working dog[.]"  Brooks v. Anderson Police Dep't, City of Anderson, 975 N.E.2d 395, 397 n.4 (Ind. Ct. App. 2012) (cleaned up).

[2] Field reports are records that result from a drug detection dog's performance in the field—as opposed to a drug detection dog's performance during training, which result in training records.

[3] In the circuit court, at his request, Cox was not referred to as an officer, as he no longer worked for a law enforcement agency.

Before us, as to the standard of review, Grimm contends that we must review without deference, as opposed to for clear error, the circuit court's determination that Ace was reliable. As to the merits, Grimm argues that, no matter which standard of review applies, the circuit court erred in determining that probable cause existed. The State responds that the standard of review is for clear error, and asserts that the circuit court did not clearly err in determining that Ace was reliable. Alternatively, the State maintains that, even if probable cause did not exist, the "good faith" exception to the exclusionary rule applies.

In Part I below, we conclude that the ultimate question of probable cause to conduct a warrantless search of a vehicle based on a drug detection dog's alert is reviewed *de novo*; *i.e.*, the standard of review as to the issue of probable cause to search based on a drug detection dog's alert is *de novo*. A determination of probable cause involves a two-step process. First, a court must identify all of the relevant historical facts that were known to the officer at the time of the search and, if necessary, any relevant or disputed background facts. Second, the court must determine whether those facts give rise to probable cause to search. We conclude that the issue of a drug detection dog's reliability is a factual question. Accordingly, an appellate court reviews for clear error a trial court's determination as to whether a drug detection dog is, or is not, reliable. In Miller, 474 U.S. at 114, the Supreme Court concluded that, where an issue falls somewhere between a clear legal issue and a simple historical fact, the determination of the nature of the issue turns on an analysis of which judicial actor is better positioned to decide the question. As explained below, the issue of a drug detection dog's reliability is, in our view, a background fact that falls

somewhere between a clear legal issue and a simple fact. A trial court is better positioned than an appellate court to determine the issue. An issue as to a drug detection dog's reliability requires a trial court to assess the credibility of lay and expert witnesses; to watch, when available, a recording of a drug detection dog's scan; to weigh and determine the weight to be given documentary evidence, such as the drug detection dog's training records, field reports, and certifications; to consider the qualifications of any experts, and their opinions about the evidence; and to determine whether, under the totality of the circumstances, the drug detection dog is reliable; and whether the drug detection dog's alert indicated that drugs were present. As such, a trial court is better positioned than an appellate court to determine a drug detection dog's reliability.

In Part II below, we hold that the circuit court did not clearly err in determining that Ace was reliable, as an abundance of evidence supports the circuit court's finding that Ace was reliable. We conclude that, under the totality of the circumstances, Sergeant Lamb had probable cause for the search, and we do not address the State's argument as to good faith.

## BACKGROUND

### Charges and Motion to Suppress

On April 19, 2014, in the circuit court, the State charged Grimm with possession of heroin with intent to distribute and other drug-related crimes. On May 23, 2014, Grimm filed a motion to suppress drugs that had been found in a vehicle that he had been driving. On multiple days, December 17, 2014, January 5 and 13, 2015, and March 17, 2015, the circuit court conducted a hearing on the motion to suppress.

**Sergeant Lamb's Testimony Regarding the Traffic Stop**

At the hearing, as a witness for the State, Sergeant Lamb testified that, on April 18, 2014, a detective with the High Intensity Drug Trafficking Area team provided him with a description of a man who was suspected to be driving north on Interstate 95 from Atlanta, Georgia to the Baltimore area with a large quantity of controlled dangerous substances. On April 19, 2014, Sergeant Lamb was informed that the man was driving a maroon Honda that was registered in Georgia, that there were multiple occupants in the Honda, and that the man was expected to drive from Maryland Route 100 onto the northbound side of Maryland Route 295. That same day, Sergeant Lamb saw the Honda travel from Maryland Route 100 onto Maryland Route 295, and saw that, including the driver, the Honda had three occupants who were not wearing seat belts. Sergeant Lamb initiated a traffic stop.

Sergeant Lamb testified that Grimm was in the Honda's driver's seat. According to Sergeant Lamb, Grimm's "clothing looked disheveled," and "[h]is hair looked unkempt[,]" which indicated to Sergeant Lamb that "he had been driving for a long time . . . and had[ not] been staying anywhere." Sergeant Lamb spoke with Grimm, who "was kind of mumbling" and "rambling a little bit." Grimm did not make eye contact when he was addressing Sergeant Lamb. Grimm, however, appeared to be "very calm."

Grimm provided Sergeant Lamb with his Maryland driver's license and the Honda's registration. Two days earlier, the Honda had been registered in Georgia to a man named Johnny Lee Oglesbee, Jr. Grimm told Sergeant Lamb that he had bought the Honda, but could not afford to register the Honda in his name. Grimm did not say who Oglesbee was. Grimm told Sergeant Lamb that he and three other people had traveled from Baltimore to

Atlanta for approximately one week to visit friends and buy the Honda. Grimm said that he had paid for plane tickets from Baltimore to Atlanta for all four of them.

A woman named Davita Henry was in the front passenger seat. A man named Aaron Chase was in the backseat,[4] directly behind Grimm. During the traffic stop, Henry stared straight ahead, and never turned to look at Sergeant Lamb, who was standing on the Honda's passenger side while speaking to Grimm. Meanwhile, Chase, who "was leaning forward to engage [Sergeant Lamb] in conversation" while he was speaking to Grimm, "was very open with the fact that he was[]" not wearing a seat belt, and was "overly polite[.]" Sergeant Lamb explained that people who are "overly polite" may be trying to distract law enforcement officers from "what[ is] going on[.]" Grimm told Sergeant Lamb that there had been a fourth occupant in the Honda, who had been dropped off at an Element Hotel. Grimm told Sergeant Lamb that the fourth occupant and Henry were women whom he knew from a dance club, and that Chase was his friend.

At some point, Sergeant Lamb asked Grimm to exit the Honda and walk to the rear of the Honda. Grimm did so. And, after speaking to Sergeant Lamb, Grimm returned to the driver's seat. Grimm did not fully close the driver's door, and kept his left foot on the asphalt. Grimm also placed a pillow on the door's "windowsill[,]" then laid his head on the pillow. Sergeant Lamb became concerned that Grimm would try to run away.

Sergeant Lamb suspected that criminal activity was afoot, in light of the information

---

[4]In a separate case, the State charged Chase with drug-related crimes. Although Grimm and Chase were not codefendants, the hearing on the motion to suppress concerned both of their cases. Each defendant was represented by his own counsel.

he had received from Grimm that four individuals had flown from Baltimore to Atlanta to buy the Honda, and Grimm had paid for the airline tickets, yet, Grimm allegedly was not able to afford to register the Honda in his name, and the circumstance that Chase was overly polite while Henry stared straight ahead. Sergeant Lamb observed that the Honda was a dented, older model, two-door Accord with high mileage and faded paint. Sergeant Lamb testified that both Baltimore and Atlanta are "source cities for" controlled dangerous substances.

Sergeant Lamb used his radio to obtain information about Grimm's Maryland driver's license and the Honda's registration, and he learned that both were valid. Based on his observations, Sergeant Lamb requested a K-9. While Sergeant Lamb was writing warnings for the failure to wear seat belts, Officer Keightley of the K-9 Unit arrived with Ace, a drug detection dog. Sergeant Lamb informed Officer Keightley of what he had observed, and requested a dog scan of the Honda. Officer Keightley told Sergeant Lamb that he wanted the Honda's occupants to exit the Honda before the dog scan occurred. After the Honda's occupants exited the Honda, Officer Keightley and Ace performed a dog scan, and Officer Keightley advised that Ace had alerted. Sergeant Lamb searched the Honda, and found a large amount of heroin and amphetamine in the "right rear panel[,]" which he described as the "plastic and vinyl armrest and side rail" behind the passenger's door.

**Testimony of Officer Keightley, Ace's Handler and One of the State's Experts**

As a witness for the State, Officer Keightley of the Maryland Transportation Authority Police testified that he had been a member of the K-9 Unit since February 2012.

In April 2012, Officer Keightley started working with Ace. Officer Keightley testified about Ace's training and certification. For three months, from April 2012 to July 2012, Cox and Officers McNerney and McCarty provided Ace's initial training. During Ace's initial training, he was trained to recognize the odors of five drugs: marijuana, cocaine, heroin, methamphetamine, and methylenedioxy-methamphetamine.[5] After Ace's initial training, he was trained once a week, for an average of seven hours a week, using "narcotic aids"—*i.e.*, substances that the crime laboratory had tested and determined to be drugs. The training is designed to mimic events that occur in the field. During Ace's training, usually, a trainer would set one or multiple narcotic aids in a given area, such as a vehicle or a building; the narcotic aids would sit for twenty to thirty minutes; and then, Officer Keightley and Ace would search the area. Ace's training was documented with a training record that listed dates, times, the narcotic aids that were used, the weights thereof (ranging from a gram to ten pounds), where they were hidden, and whether Ace found them.

The Maryland Transportation Authority Police certifies dogs and their handlers every six months. Like other drug detection dogs, to become certified, Ace was tested in "two or three" capacities from among "various areas[,]" including a building, a vehicle, luggage, and an outdoor area. Officer Keightley and Ace were first certified on July 6, 2012. Officer Keightley and Ace had been certified five times, and were certified as of April 19, 2014. At that time, Officer Keightley and Ace had most recently been certified

---

[5]Methylenedioxy-methamphetamine is also known as "MDMA," "Molly," and "Ecstasy." National Institute on Drug Abuse, MDMA (Ecstasy/Molly) (Oct. 2016), https://www.drugabuse.gov/publications/drugfacts/mdma-ecstasymolly [https://perma.cc/S4A7-ZSY3].

on January 22, 2014. As of the date of the hearing, Ace had performed dog scans during approximately 100 traffic stops. The circuit court admitted Officer Keightley as an expert in the field of "K-9 police dog[s] and the detection of controlled dangerous substances"— specifically, marijuana, cocaine, heroin, methamphetamine, and methylenedioxy- methamphetamine.

Without objection, the circuit court admitted into evidence: Ace's training records from April 2012 through April 2014; Ace's field reports—which Officer Keightley completed every time that he utilized Ace—from when Officer Keightley and Ace were first certified on July 6, 2012 until April 19, 2014; the Maryland Transportation Authority Police Narcotic/Explosive K-9 Certification Guidelines; and the Maryland Transportation Authority Police K-9 Standard Operating Procedures, which included guidelines for training dogs and handling explosive aids and narcotic aids. The circuit court also admitted into evidence: Officer Keightley's and Ace's July 6, 2012 certification, which was accompanied by score sheets that showed which narcotic aids were used, where they were hidden, and whether Ace found them; Officer Keightley's and Ace's December 10 and 14, 2012 certification, and Officer Keightley's and Ace's July 1, 2013 certification. The second-to-last certification was associated with two dates because, on December 10, 2012, Officer Keightley and Ace passed a test that involved a dog scan of a vehicle, but did not pass a test that involved a dog scan in a building; on December 14, 2012, Officer Keightley and Ace re-took, and passed, the test that involved a dog scan in a building, and Officer McNerney recertified Officer Keightley and Ace.

According to Ace's field reports, between July 6, 2012 and April 19, 2014, Ace had

alerted to a vehicle on 51 occasions. Of those 51 occasions, no drugs were found in the vehicle on 19 occasions. Officer Keightley testified that a "non-productive response" occurs when a drug detection dog alerts to a vehicle or building, and an officer searches the vehicle or building, but does not find any contraband.[6] Officer Keightley explained that Ace might alert where drugs used to be, but are no longer, inside a vehicle. Indeed, with regard to 10 of the 19 non-productive responses to vehicles, during interviews, at least one of the vehicle's occupants admitted that drugs had recently been in the vehicle. Thus, Ace had only 9 non-productive responses where there was no discovery of drugs, and no admission that drugs had recently been in the vehicle. In response to Ace's non-productive responses, Officer Keightley extended Ace's searching time during training. Between January 22, 2014—Officer Keightley's and Ace's most recent certification before the time of the traffic stop on April 19, 2014—and April 19, 2014, Officer Keightley did not receive any warnings that he was doing anything inappropriate.

Officer Keightley testified that, on April 19, 2014, he responded to a traffic stop that Sergeant Lamb had initiated. At the scene, Officer Keightley was asked to conduct a dog scan of the Honda with his K-9, Ace. At the time, both of the Honda's windows were rolled down. Officer Keightley brought Ace to the front of the Honda. On the way to the front of the Honda, Officer Keightley and Ace passed the passenger's door, where Sergeant Lamb ultimately found drugs. Officer Keightley did not notice any reaction by Ace while

---

[6]Officer Keightley testified that the term "non-productive response," like the term "false alert," indicates that a drug detection dog alerted to an area, and an officer searched the area, but did not find any contraband.

they passed the passenger's door. At that time, Officer Keightley had not yet commanded Ace to search. Once in front of the Honda, Officer Keightley told Ace to "foot"—*i.e.*, to sit next to him. When Ace was quiet, Officer Keightley commanded Ace to search. Officer Keightley and Ace started walking around the Honda counter-clockwise. As Officer Keightley "was trying to present the passenger-side headlight[,]" Ace pulled toward the driver's side on two occasions. After Ace came around to the driver's side, he "bracketed"—*i.e.*, he moved his head in an attempt to locate an odor. Once Officer Keightley and Ace reached the driver's door, Ace stopped walking, put his forelegs on the driver's door, stuck his head into the Honda, and did a "focus sniff"—*i.e.*, closed his mouth and sniffed extremely rapidly. Then, Ace sat, which Officer Keightley testified was an alert that the Honda was contaminated with, or had recently been contaminated with, drugs. The dog scan took thirty-seven seconds. While drug detection dogs may be trained to alert by staring, scratching, or biting at the source of the odor, Ace was trained to alert by sitting.

On May 16, 2014, Officer Keightley received an e-mail from a member of the K-9 Unit with a recommendation by Officer McNerney concerning an issue as to the calculation of Ace's training hours. Before receiving the e-mail, Officer Keightley would indicate in Ace's training records that he was trained for seven hours on one day each week. In the e-mail, however, Officer Keightley was advised that there was a new method of calculating the number of hours of Ace's training, and that Officer Keightley should count only the time from when the first narcotic aid was set to when the last test was conducted. Under the new calculation method, Ace had not received the sixteen hours of monthly training that was required for certification, and Officer Keightley and Ace were decertified. After

- 11 -

Officer Keightley received the e-mail, he trained Ace on two additional days. On May 19, 2014, Officer McNerney recertified Officer Keightley and Ace. The circuit court admitted Officer Keightley's and Ace's May 19, 2014 recertification into evidence. Officer Keightley testified that, after Officer McNerney recertified Ace, he usually trained Ace at least four days a week, for a total of sixteen to twenty hours a month.

On cross-examination, Officer Keightley acknowledged that Ace had previously alerted to tobacco, air fresheners, a tennis ball, and the odor of "KONG" chew toys. Officer Keightley also acknowledged that, at some point, Officer McNerney told Officer Keightley that, by standing still behind Ace, Officer Keightley was "cueing" Ace—*i.e.*, giving Ace a cue to take certain actions. Officer Keightley testified that he did not cue Ace during the dog scan of the Honda.

Officer Keightley acknowledged that, in November 2013, Ace was trained only twice, for a total of three hours and fifteen minutes—calculated from when the first narcotic aid was set to when the last test was conducted. In February 2013, Ace was trained a total of eleven hours and nineteen minutes, calculated in the same way. According to a summary of Ace's training records that Grimm's counsel had prepared, using the new formula for calculating the number of hours that Ace had been trained, Ace had not received the required sixteen hours of training in any month from July 2012 through 2014. Officer Keightley testified that this was so because the new formula for calculating the number of hours that Ace had been trained had not yet been implemented.

**Testimony of Sergeant Davis, One of the State's Experts**

As a witness for the State, Sergeant Davis testified that, in 1991, she became a

- 12 -

handler with the K-9 Unit of the Montgomery County Police Department. Sergeant Davis testified that, initially as a handler, she managed five K-9 teams, and that throughout her career she managed both patrol K-9 teams and narcotics K-9 teams. In 1998 or 1999, Sergeant Davis became a K-9 trainer. In 2001, Sergeant Davis placed in the top twenty K-9 officers in the United States Police Canine Association's Patrol Dog Field Trials. In 2008, Sergeant Davis was assigned as the K-9 unit's head trainer. During that time, she developed the K-9 Unit's current mandatory certification processes for patrol K-9s and narcotics K-9s, and trained the K-9 Unit's first firearms detection K-9 teams. In 2009, Sergeant Davis began writing for Police K-9 Magazine. In that capacity, between 2009 and 2014, Sergeant Davis responded to questions about training dogs in Police K-9 Magazine. Sergeant Davis testified that she had run events at the United States Police Canine Association's national training seminar, and had given presentations at Police K-9 Magazine's conference. Sergeant Davis had trained a total of sixty-five K-9 patrol teams, and trained a total of thirty-six K-9 detection teams. The parties stipulated that Sergeant Davis was an expert in K-9 training and handling. Sergeant Davis testified that she was not being paid for her testimony, apart from what she was paid for being on duty while testifying.

Sergeant Davis explained that Maryland law does not require drug detection dogs to be certified, and that there are no State-wide requirements for drug detection dog performance. Although Maryland law does not require that drug detection dogs be certified, Sergeant Davis developed a process for certifying drug detection dogs in the Montgomery County Police Department's K-9 Unit. Sergeant Davis testified that the K-9

Unit uses its best efforts to follow or exceed the standards that are recommended by the United States Police Canine Association. According to Sergeant Davis, the K-9 Unit trains drug detection dogs with both odor recognition tests and "environmental hides[,]" which are searches of buildings, vehicles, and parcels. Sergeant Davis described the process through which the Montgomery County Police Department's K-9 Unit trains drug detection dogs, to consist of: use of odors of controlled dangerous substances; distractions, such as dog food; and a reward, in the form of a ball on a rope. Sergeant Davis testified that the Maryland Transportation Authority Police's K-9 Unit's certification process generally comports with industry standards. Sergeant Davis advised that the Montgomery County Police Department's K-9 Unit trains approximately twelve other local K-9 Units—including, at one point, the Maryland Transportation Authority Police's K-9 Unit.

In August 2014, the Maryland Transportation Authority Police's K-9 Unit requested that members of the Montgomery County Police Department's K-9 Unit serve as judges in the Maryland Transportation Authority Police's K-9 Unit's certification process. Sergeant Davis and two other members of the Montgomery County Police Department's K-9 Unit served as judges. The certification process took place on August 19, 2014, and included a search of a vehicle, then a search of a parcel, and then a search of an indoor area. Officer Keightley and Ace participated in, and were successful in, the certification process. According to Sergeant Davis, on one occasion during the certification process, Ace alerted to a vehicle containing a controlled dangerous substance, but Officer Keightley moved Ace so fast that they passed the vehicle that contained the controlled dangerous substance, and then moved to the next vehicle. At that time, Ace tried to get Officer Keightley to return

to the original vehicle. Sergeant Davis referred to this situation as "a handler miss[,]" for which Ace was not responsible—*i.e.*, Officer Keightley missed Ace's alert. Sergeant Davis stated that Ace had been "correct in his work." Sergeant Davis opined that the handler miss was not a basis for failure because, in any certification, one handler miss is permissible.

Before testifying, Sergeant Davis reviewed Officer Keightley's and Ace's certifications, as well as Ace's training records from his initial training in 2012 to July 2014. Sergeant Davis testified that she did not observe any major changes in the process of training Ace, including the training routine and the types of narcotic aids that were used, between April 19, 2014—when the traffic stop occurred—and July 2014. Sergeant Davis testified that Officer Keightley and Ace performed satisfactorily during training.

Sergeant Davis testified that she was aware that Officer Keightley and Ace had been decertified in May 2014 as a result of the issue with the calculation of the number of Ace's training hours. Sergeant Davis testified that she would not have decertified Officer Keightley and Ace, as Ace's "skills . . . were not affected one iota by the way" in which the Ace's training hours were calculated. Similarly, Sergeant Davis testified that the issue with regard to the calculation of the number of Ace's training hours did not affect Officer Keightley's and Ace's January 22, 2014 certification. Sergeant Davis explained: "Either [Ace] knows the odors[,] or he does[ not]. And he can perform, or he cannot." Sergeant Davis testified that she did not know of any other K-9 Unit that had decertified a handler and a drug detection dog "based on training hours." Sergeant Davis testified that, when a drug detection dog has not been trained for enough time, there is usually "an opportunity

- 15 -

for remediation[,]" which Ace received.

According to Sergeant Davis, in 2013, during Ace's training, he was placed in a total of 209 scenarios. Of those, Ace falsely alerted on 24 occasions. Sergeant Davis explained that she "expect[ed false alerts] to occur[,]" and that she did not think that any "particular amount" of false alerts was "acceptable or unacceptable." Sergeant Davis noted that there is no industry standard with regard to an unacceptable number of false alerts, and that the Montgomery County Police Department's K-9 Unit did not have such a standard. Sergeant Davis testified that she "would look at each scenario and ask [] what is the cause of the" false alert. Sergeant Davis testified that Ace's false alerts during training were not "[s]ignificant" in light of the reasons for Ace's false alerts. According to Sergeant Davis, on multiple occasions, Ace falsely alerted when he was "asked to search for a very long time in an environment where there was no" controlled dangerous substance. Sergeant Davis opined that such environments were "counter-productive" because they simply provided Ace with "an opportunity to fail."

During Sergeant Davis's testimony, the recording of the traffic stop from the dashboard camera in Sergeant Lamb's vehicle was played. Addressing the circumstance that Ace did not alert as he passed by the passenger side, Sergeant Davis explained that Officer Keightley needed to ensure that Ace would pass by the Honda's occupants safely, and was probably tightly controlling Ace with his leash and with voice commands. Sergeant Davis opined that, although Ace "was clearly excited and [] wanted to work[,]" he appeared to be "in an obedient state" as he passed by the passenger side.

Sergeant Davis observed that, once Officer Keightley and Ace reached the front of

the Honda, Ace was barking and "still a little bit excited." Officer Keightley calmed Ace, and had Ace sit near him. Sergeant Davis noted that, after Officer Keightley gave the command to search, Ace immediately moved toward the driver's door. With physical or verbal commands, Officer Keightley had Ace move toward the front right headlight. Ace briefly checked the front of the Honda, then moved toward the driver's door again. Again, Officer Keightley had Ace return to the front right headlight. Afterward, however, Ace moved toward the driver's door for a third time. According to Sergeant Davis, while Officer Keightley was trying to direct Ace to the front right headlight, Ace independently insisted on moving to the driver's side. Sergeant Davis testified that Ace's behavior indicated that he had made an "independent discovery of" an odor of controlled dangerous substances, and was attempting to locate the source. Sergeant Davis testified that, while in front of the Honda, Ace engaged in "bracketing"—*i.e.*, whipping his head. Ace moved toward the driver's door and jumped on it "independently." Then, Ace lifted his head into the window, and engaged in "focus sniffing[.]"

Sergeant Davis observed that, for six minutes during the traffic stop, the driver's door was open. Sergeant Davis explained that the vehicles on Maryland Route 295 that were passing by the Honda "would create a vacuum and pull air[,]" as well as the odor of controlled dangerous substances, out of the driver's doorway. Sergeant Davis also noted that, because vehicles are climate-controlled, simply driving down a highway can "create odor pockets in places" that do not contain the source of the odor.

Addressing Ace's alert near the driver's door, Sergeant Davis testified that Ace "was very firm in[,]" and "very committed in[,] his sit. . . . [Ace] held it very nicely." Sergeant

Davis testified that Ace was not "unsure of himself" when he alerted.  Sergeant Davis testified that the dog scan "took a very little bit of [] time" because "there was a lot of odor" and it was not "difficult for" Ace to identify the odor.  Sergeant Davis testified that the dog scan's length—thirty-seven seconds—was within Ace's "capacity to manage himself without" falsely alerting.

Sergeant Davis testified that the recording of the traffic stop from the dashboard camera in Sergeant Lamb's vehicle contained no evidence that Ace's alert was false. Sergeant Davis explained that Ace's "work was very independent[,]" as evinced by the circumstance that Ace moved toward the driver's door on two occasions before Officer Keightley allowed him to go there.  According to Sergeant Davis, Officer Keightley's "direction was more of a distraction than it was an influence on" Ace.  Sergeant Davis testified that Ace "already had clear identification of" the odor of a controlled dangerous substance, and that, when Ace alerted, he was indicating "that he knew there was odor there."  Sergeant Davis advised that Officer Keightley did not cause Ace's alert "in any way, shape, or form[.]"  Sergeant Davis testified that she did not see any evidence of cueing by Officer Keightley.  Sergeant Davis testified that, to a reasonable degree of certainty, based on her training, knowledge, and experience as a K-9 trainer, Officer Keightley and Ace were "competent to be working the street and deploying, and making probable cause decisions on the street."  Sergeant Davis testified that her opinion was "[b]ased on the totality of the circumstances, [and] looking at all of the training records" and having observed Officer Keightley and Ace on three occasions.

On cross-examination, Sergeant Davis acknowledged that, before testifying, she had

not reviewed Ace's field reports, which, according to her, did not have "as much bearing" as his training records, because Ace's training took place in environments that were more controlled than those in the field. Sergeant Davis explained that, in the field, "unintended cross-contamination" can occur. Addressing the circumstance that, according to his field reports, Ace alerted 9 times when there was no discovery of drugs, and no admission that drugs had been in the vehicle, Sergeant Davis testified that that did not concern her "even in the least" and explained: "It[ i]s like putting garbage in a garbage can. And you take the garbage out[,] and you try to clean it, . . . but you stick your head in that garbage can[,] and it still smells like garbage."

### Testimony of Cox, One of Grimm's Experts

As a witness for Grimm, Cox—one of the people who provided Ace's initial training in 2012—testified that, in 1997, he joined the Baltimore Police Department's K-9 Unit as a handler. In 2000, Cox became the Baltimore Police Department's K-9 Unit's chief trainer. Cox trained a total of approximately eighty dogs. In 2006, Cox left the Baltimore Police Department. In 2007, Cox became the Maryland Transportation Authority Police's K-9 Unit's only trainer. In October 2012, Cox left the Maryland Transportation Authority Police. The parties stipulated that Cox was an expert in K-9 training and handling.

Cox acknowledged that he was compensated for his travel and, additionally, that he was paid $200 an hour, and that he had earned approximately between $4,000 and $5,000[7]

---

[7]On cross-examination, after Cox testified that he was paid $200 an hour, the prosecutor asked Cox: "[H]ow many hours have you spent?" Cox responded: "I guess we're somewhere around, between reviewing documents, this whole book, and gathering

- 19 -

working on this case. Cox testified that, because he was being paid to testify, "apparently[, he] was not allowed to speak about the things that went on while [he] was employed [by] the State"—"[k]ind of like a gag order."

Before testifying, Cox reviewed, among other documents, Ace's training records, his field reports, the Maryland Transportation Authority Police Narcotic/Explosive K-9 Certification Guidelines, and the recording of the traffic stop from the dashboard camera in Sergeant Lamb's vehicle.

Similar to Sergeant Davis, Cox testified that Ace's training records were more important than his field reports. Cox testified that, in his opinion, after reviewing Ace's training records and the recording of the traffic stop, Ace was unreliable "at this point." According to Cox, the Maryland Transportation Authority Police's K-9 Unit had failed to maintain Ace's maintenance training for over a year. Cox testified that once a drug detection dog is certified "[i]t takes a keen eye in order for a trainer . . . to watch a dog perform and work and understand what the team is actually saying and doing. And in this case, it didn't happen." Cox testified that he felt that Officer Keightley was "basically, just like a rogue police." Cox opined that it was not Officer Keightley's fault, as the Maryland Transportation Authority Police's K-9 Unit did not "provide him a trainer to sit with him[,] because he's still green for a period of time[,] in order for him to gain the experience that was necessary."

_____

things[,] probably about between four and five thousand." Given that 4,000 hours is equal to more than 166 entire days, it is evident that Cox was referring to the amount of money that he had earned while working on this case, not the number of hours that he had spent working on this case.

After being asked whether he noticed that there was a training session for Ace on November 12, 2012 and there was no other training session until December 12, 2012, Cox testified that, due to "the gag order[,]" he could not answer that. Cox indicated, however, that a drug detection dog should not go twenty or thirty days without being trained unless the officer is on extended leave. Cox noted that, when he went through the federal trainer certification, there was a distinction between "clock time" and "sniff time." According to Cox, sniff time is the time that a dog is actually engaged in performing scans. Cox testified that, even if a law enforcement officer were at a training facility for eight hours, a drug detection dog might spend only a small portion of that time performing scans.

Cox testified that he wanted to train his dogs to be as close to "100 percent as" he could. According to Cox, he "usually tr[ied] to hold [drug detection] dog[s] to a 95 percent ratio" and, if a dog dropped under 90 percent, he would "pull him off the road and find out why[.]" Cox indicated that, when a dog is being evaluated, he sets a standard to figure out if the dog "has a problem in falsing." Cox stated: "There's a percentage rate that I give, it's usually four percent." According to Cox, between April 15, 2013 and March 24, 2014, during Ace's training, he performed 179 scans. Of those, Ace falsely alerted to vehicles 15 times, and falsely alerted indoors 29 times, for a total of 44 false alerts. Cox calculated that 4% of 179 scans is approximately 7.16. Cox stated that Ace's number of false alerts— 44—is "five times over, or six times over [Cox's] allotted falsing." Cox acknowledged that, as Sergeant Davis testified, there are no State-wide requirements for drug detection dog performance. Cox opined, however, that Maryland should have such requirements.

Cox testified that users of marijuana make blunts by sprinkling marijuana into

tobacco leaves. Cox explained that this circumstance can condition drug detection dogs to alert to the odor of tobacco. Cox testified that Ace's records showed that Ace had alerted on plastic and "indicated on blanks which is possibly human odor." According to Cox, this was "a red flag" and someone should have investigated what may have been going on with Ace.

During Cox's testimony, the recording of the traffic stop from the dashboard camera in Sergeant Lamb's vehicle was played. Without specifically testifying that Ace was engaged in excessive barking, Cox asked that the video be paused and stated: "I usually don't like that excessive barking[.]" Cox testified that "excessive barking" "usually takes [] energy away from" a drug detection dog, and the dog then does not perform as well. Cox stated that he "would actually want the officer to just calm the dog down" so that the dog would not be "coming into the field already exhausted."

Cox testified that, according to the National Weather Service, on April 19, 2014, there was a four-mile-an-hour wind. Cox theorized that, "if we assume that, for argument's sake," the wind was "blowing from the bumper to the front bumper[,]" he would expect that, when he passed the passenger door, Ace would "whip his head around and catch some type of odor." According to Cox, if the wind were blowing in that direction, "there's enough that's going to plume out on the side," and Ace "should catch the odor when he passed the car passenger door."

Cox noted that, even though Ace always started scans by going counterclockwise, on this occasion, he went in the other direction "on his own." Cox explained that Officer Keightley used a dog toy to motivate Ace to come to the headlight. Cox observed that, at

that point, Officer Keightley was behind Ace. Cox observed that Officer McNerney had once told Officer Keightley that he was "cueing" Ace by standing still behind him.

Cox testified that he would not have "move[d Ace] unless he was . . . actually performing his task[,]" and that, when Ace came "running around" to the driver's side, he did not "actively sniff at all." Cox opined that Ace "just jumped into object search" and then jumped onto the driver's door. Cox opined that Ace alerted to a "human scent[,]" which resulted from Grimm leaning on the driver's door. According to Cox, Ace was "imprinted on" human scent because, during his training, the narcotic aids were not properly maintained. Cox testified that Ace's training records contained no evidence that human scent had been used as a distracter—a substance that a drug detection dog is "extincted" off of during training. Cox also opined that the narcotic aids were not replenished often enough to ensure that they were still "producing" a narcotics odor.

Cox testified that, although there was evidence that Ace was trained to go to the source of an odor, he did not attempt to jump through the driver's door's window. Grimm's counsel asked whether it was significant that, after alerting, Ace turned his head toward Officer Keightley. Cox responded that this indicated that Ace was getting "weak in his field[,]" and that he was essentially asking Officer Keightley: "[D]id I [do] right?" When asked whether he observed any evidence of Ace "bracketing[,]" Cox responded: "No[.]"

Cox opined that, based on his experience and expertise, "[t]here was no doubt in [his] mind that [Ace] was unreliable." As reasons for his opinion, Cox referenced "how many times [Ace had] falsed, what type of odors [Ace had] falsed on," "the human odor," "the lack of odor being produced by the narcotics [aids] that were set out," deficiencies in

Ace's training, and the lack of "a certified trainer to . . . watch [Ace] and make sure . . . [that] the behavior that he[ was] offering in training [was] stopped at the appropriate time[.]" Cox also opined that Officer Keightley and Ace should have failed the certification process on August 19, 2014.

On cross-examination, Cox acknowledged that the Maryland Transportation Authority Police Narcotic/Explosive K-9 Certification Guidelines do not set a maximum percentage of false alerts of 5%. Cox also acknowledged that the Maryland Transportation Authority Police K-9 Standard Operating Procedures did not require analysis of the purity of narcotic aids. Cox testified: "I wish [that] I could speak about the steps and measures that I took [] to try to clear this up, but I[ am] not allowed to at this point. But if I could I would tell you what I tried to do."

### Testimony of Officer McNerney, One of Grimm's Experts

As a witness for Grimm, Officer McNerney—one of the people who provided Ace's initial training in 2012—testified that, in 2006, he started working for the Transportation Security Administration's K-9 Unit. Officer McNerney became a handler for an explosive detection dog. In 2009, Officer McNerney joined the Maryland Transportation Authority Police's K-9 Unit as a trainer. Initially, Officer McNerney trained dogs only in explosive detection. At that time, Cox was the head trainer, and Officers McNerney and McCarty were assistant trainers in explosive detection and drug detection, respectively. In October 2012, Cox left the Maryland Transportation Authority Police, leaving only Officers McNerney and McCarty as trainers. In September 2013, Officer McCarty went on medical leave, and Officer McNerney assumed responsibility for training dogs in both explosive

detection and drug detection. Officer McNerney testified that "it was tough" to train dogs in both explosive detection and drug detection. Officer McNerney testified that he went to command and asked that training explosive and drug detection dogs be made a full-time position, but his request was denied. Officer McNerney testified that, "numerous times," he communicated to his command staff that he was available only ten of the twenty-six training days between September 2013 and March 2014, and that handlers did not show up for training on eight of the days when he was not present. On March 11, 2014, Officer McNerney stepped down as a trainer because he did not "want the liability" and because he was concerned that the drug detection and explosive detection dogs were not proficient because they were not being trained. In May 2014, however, Officer McNerney "was ordered back" to the K-9 Unit as part of "a full-time position." The circuit court admitted Officer McNerney as an expert in the field of K-9 training and handling.

Officer McNerney was responsible for Officer Keightley's training from September 2013 through March 2014. Officer McNerney testified that he determined that Ace had "a lot of [] issues" as to false alerts, and that Ace was not trained for the required amount of time. According to Officer McNerney, Ace had a "pretty high" number of false alerts, and he extended to Officer Keightley an offer to train Ace, but Officer Keightley did not "show up to train on those days[.]" According to Officer McNerney, the purpose of such training would be to "proof" Ace off of such sources of odor as air fresheners and tobacco.

Contrary to Officer Keightley's testimony, Officer McNerney testified that, between September 2013 (when Officer McNerney assumed responsibility for training dogs in both explosive detection and drug detection) and April 19, 2014 (the date of the

traffic stop), Ace was not trained seven hours a week, or sixteen hours a month. Officer McNerney testified that, between those dates, he trained Ace only ten times. Officer McNerney testified that, according to Ace's training records, between those dates, Ace was not trained the required sixteen hours a month that was required for certification. On May 17, 2014, pursuant to Officer McNerney's recommendation, Officer Keightley and Ace were decertified. Two days later, on May 19, 2014, Officer Keightley and Ace were recertified.

At some point during Ace's training, Officer McNerney noticed that Officer Keightley was cueing Ace. According to Officer McNerney, because Officer Keightley knew where the narcotic aids were, he cued Ace by subconsciously slowing down and walking behind him. Officer McNerney opined that it was a disfavored practice for handlers to set the narcotic aids, as that can lead to cueing. Officer McNerney also testified that he believed that the narcotic aids had not been "switched out" since 2009. Officer McNerney opined that it was important to use fresh narcotic aids during training.

Officer McNerney opined that, as of March 11, 2014, when he resigned, Ace was unreliable "[b]ased on . . . the falsing issues compared to the training that was conducted from the previous -- the previous trainer had set the requirements of [90%] and [Ace] fell below that [90%] range where, if he wasn't reliable." Officer McNerney acknowledged that, to be certified by the K-9 Unit, a drug detection dog need only score 87.5%. Officer McNerney opined, however, that he held drug detection dogs to a higher standard in training because, unlike scans in the field, training takes place in controlled environments.

Officer McNerney agreed with Sergeant Davis that the "handler miss" was not a

basis for failure of the August 19, 2014 certification process. On cross-examination, Officer McNerney acknowledged that, on January 22, 2014, he conducted a certification test, which Officer Keightley and Ace passed; and, on that date, he approved the certification. Officer McNerney acknowledged that Officer Keightley and Ace were not decertified before April 19, 2014—*i.e.*, that the certification was valid when the traffic stop occurred.

### Circuit Court's Ruling and Findings

After hearing arguments by counsel, the circuit court denied the motion to suppress, finding as follows:

> Grimm was driving the [Honda]. It had the Georgia plates; it was here in Anne Arundel County. [] Chase was a passenger, as well as [Henry]. And[,] back on April 19[,] 2014, Sergeant Lamb received some type of be[-]on[-]the[-]lookout, . . . from his contacts in [the Drug Enforcement Administration] and [the High Intensity Drug Trafficking Area].
>
> * * *
>
> [] Sergeant [Lamb stopped] the [Honda], and[,] unfortunately for [] Grimm and [] Chase and [Henry], none of them were wearing seat[ ]belts, which gave [] Sergeant [Lamb] th[e] reasonable suspicion that he needed to conduct the traffic stop[.]
>
> * * *
>
> At the [Honda], before [Ace] arrives[, t]here is the discussion about Atlanta and airline tickets[,] and [] Grimm puts his head on the pillow[,] and he leans with [his left] foot out of the [Honda], and the [back]seat passenger, [] Chase, is overly talkative, and [Henry] is not talkative. And all of those things go into [] Sergeant [Lamb]'s mind[,] and[,] in his mind[,] they are all indicia that he has someone who is a drug dealer, the nervousness and all that stuff.
>
> * * *

[A]bsent [Ace's] alert, . . . I would not have found probable cause. I would not have found [] Atlanta being a source city, the nervousness, the airline[] tickets to be enough to get into the [Honda]. So, this case rightly turns on Officer Keightl[e]y and [] Ace.

Not surprisingly[,] we have a divergence of views and a difference of opinion as to what the Court should consider to be credible. It will spoil the ending when I tell you who[m] I find to be the most credible witness. But I cannot analyze this case without telling you who[m] I find to be the most credible witness. Because[,] when I discuss Officer Keightl[e]y, he [and Ace were] certified at the time of the [traffic] stop and the [dog] scan. And [Officer Keightley and Ace were] certified on January 22[], 2014, and it was[ not] until about a month after that [when they] lost [their] certification, and it was[ not] too long after that before the certification was restored to [them].

[Officer Keightley] used all the proper terminology[—]bracketing, focus sniffing, response, et cetera. And [Officer Keightley] was certified and qualified as an expert in this area. And **the Court has found [Officer Keightley] credible,** but that[ is] not necessarily the ultimate finding because I have witnesses with expertise [that is] vastly superior to his. And I must analyze that before I can come back to Keightl[e]y to determine whether he did something [that] was proper or improper. I found [Officer Keightley] credible[,] and I found him [and Ace] to be certified[,] and I considered his training as to be in compliance or not in compliance with standard operating procedures. This is a fuzzy area.

Sergeant [] Davis and [] Cox and [] Officer McNerney presented different views of what the standard operating procedures should be. Each department writes their own standard operating procedures. Each department prepares their own standard operating procedures. And each department decides what their standard operating procedures shall be so that their K-9 officers -- well, handlers, and the dogs and the trainers are certified.

Sergeant Davis has a different view than [] Cox does of what the ultimate standards should be, but there are standards in place. And [] Maryland has not ad[o]pted rigid standards. I think that[ is] what Florida v[]. Harris[, 568 U.S. 237 (2013),] was telling us.

So, the question for the Court is, were those standards that were in place appropriate? And I think that they were. I find that there were. Was there compliance with those standards? That[ is] the second part of that issue. We have to look at the hours, we have to look at the [narcotic] aids, and we have to look at whether or not the training was in compliance with the standard operating procedures, and was there a significant or serious enough deviation to say that [Ace] or [Officer Keightley] was not competent to provide the work in the field. And we can analyze the 51 alerts, the 19 [false alert]s. And we can analyze what it . . . was due to[,] and the reasons behind it. We can look at the extended time, the distance for the training exercises,

the staleness of the [narcotic] aids, et cetera.

And[,] to do that, the Court has to look to the experts. And the experts are Sergeant [] Davis and [] Cox. [] Cox is in a perilous position at times[,] and I do think [that] he walked that tightrope that he was presented appropriately. I do not find that he strayed over any line. And I think that his answers were credible in terms of what he said and how he said it.

[Cox] and [] Officer McNerney are very close in their views. They are good and fair in their analysis. And while [Cox] is retired and [Officer McNerney] is an active [law enforcement] officer, they presented to the Court what appeared to be their view of what the optimum standards should be. . . . I am convinced that **there is dissension in the ranks. And I think that some of this was an airing of dirty laundry. But there appears to be almost a[ "]they did[ not] do it today as I did it then["] view from [] Cox. And there seemed to be from Officer McNerney, ["]you[ are] not listening to me.["] Having said that, they[ are] both credible. There is some bias, but they are credible and they have presented credible testimony.**

The Court will comment on Sergeant [] Davis. **I find [Sergeant Davis] to be the most credible witness . . . . I find [Sergeant Davis's] qualifications, her knowledge, [and] her training and experience to be impeccable.** Again, I[ am] going to spoil the ending, but I find her to be the most credible witness[,] and it is she who[m] I rely upon the most and find to be **the best and most objective observer.**

[Sergeant Davis's] comments, and I hope [that] I quote this correctly, have stuck with me ever since she said it. And when I went over and examined everything and everything over and over and over again, I could not get this comment out of my mind. ["Ace] knows the odor[,] or he does[ not]. He can perform[,] or he can[not."] And[,] with that in mind, **I find [Sergeant Davis] to be a witness who has no ties to th[is] case, neutral and unbiased** and has -- I find she has no issue with [Officer Keightley] or [Ace]. And **I find [Sergeant Davis's] analysis of the [traffic] stop and [Ace]'s actions to be credible.**

[Sergeant Davis] explains, . . . succinctly and carefully and expansively at times[,] the issues with [false alerts] or certification or protocols to the satisfaction of the Court that I can find Officer Keightl[e]y and [] Ace to be credible and to be a certified [drug detection] dog that the Court can rely upon for assessing whether or not probable cause exist[ed]. When the Court analyzes Sergeant Lamb's observations, comments, the [Drug Enforcement Administration] tip with [Ace] or, which I find credible, I find probable cause . . . to believe that there is a reasonable probability and/or a fair probability that contraband [would] be found in [the Honda].

\* \* \*

- 29 -

I disagree with [] Officer McNerney and [] Cox that there was no alert by [Ace]. I[ am] not an expert. I must analyze it on the totality of the circumstances. And I must rely upon the expert testimony. And **I find the most credible expert to be Sergeant [] Davis.** When she broke the [traffic] stop down and she went, "[]lead is tight to prevent [Ace] go in window, shows dog [Ace] has independent intention from [Officer Keightley]'s [in]tention. [Ace] insists to go to driver's [] door not once, two time[s]. Indicates target odor, get[s] to source. [Officer Keightley] took control dog leash tight, not have contact with civilian's dog, excited, wants to work. [Ace] obedience, stay, lose heel, not expect indication."

Then[,] when [Sergeant Davis] goes through all of this[,] she concludes [that] there might have been a little odor, there might have been a lot of odor, but [Ace] alerted. And she concludes that [Ace] committed, sat, held it nicely[, that] there was no evidence of a false alert, [and] that [Ace] was independent. [Officer Keightley] was more of a distraction. [Ace] knew the odor, there was no [] interference[ by Officer Keightley], no cueing from [Officer Keightley]. There was an obvious change of behavior, the head dip, the bracketing, the focused sniffing. That[,] in [Sergeant Davis's] opinion[,] **the competence of [] Ace was that he was competent to make [a] probable cause decision based upon the training records, observing the team personally[,] and reviewing the video.**

**The Court accepts that[,] and the Court finds that to be the most credible evidence in the case.**

(Emphasis added).

**Conviction and Opinion of the Court of Special Appeals**

On July 7, 2015, Grimm pled guilty to possession of heroin with intent to distribute, on the condition that he could appeal the circuit court's denial of the motion to suppress. On August 4, 2015, Grimm noted an appeal.

On April 26, 2017, the Court of Special Appeals affirmed the conviction. See Grimm v. State, 232 Md. App. 382, 386, 158 A.3d 1037, 1039 (2017). The Court of Special Appeals held that an appellate court reviews for clear error a trial court's determination as to whether a drug detection dog is reliable. See id. at 403, 158

A.3d at 1050. The Court of Special Appeals explained:

> Whether Ace was—at the time of the [dog] scan of Grimm's vehicle—a well-trained or reliable [drug detection] dog, whose alerts could be relied upon by Officer Keightley as indicating that there was a fair probability that [Grimm's] vehicle contained one of illegal drugs [that] Ace had been trained to detect, was a question of fact [that was] properly committed to the adjudicatory skill of the [trial court that] heard the evidence [that was] presented at the hearing on the motion to suppress. An appellate court is ill-equipped to determine the proper amount of weight to be given to various pages of the extensive documentation in evidence regarding a [drug detection] dog's performance during training exercises, or to evaluate the credibility of witnesses, or weigh the conflicting testimony of experts. Such factual determinations are best left to the [trial court that] hears the evidence, and are best reviewed under a "clearly erroneous" standard that gives deference to [the trial court]'s superior opportunity to evaluate credibility and weigh the evidence.

Id. at 403-04, 158 A.3d at 1050 (citations omitted).

Addressing the merits, the Court of Special Appeals rejected Grimm's contention that the circuit court clearly erred in making certain findings of fact, such as the circuit court's finding that Sergeant Davis was the most credible witness. Id. at 404-05, 158 A.3d at 1050-51. The Court of Special Appeals also rejected Grimm's assertion that, in light of alleged evidence of deficiencies in Ace's training, the circuit court clearly erred in finding that Ace was reliable. See id. at 406-07, 158 A.3d at 1051-52. The Court of Special Appeals observed that Ace and Officer Keightley were decertified for only two days, and that Sergeant Davis testified that she would not have decertified Ace and Officer Keightley. See id. at 406-07, 158 A.3d at 1052. The Court of Special Appeals rejected Grimm's contention that Officer Keightley and Ace were not "meaningful[ly]" certified at the time of the dog scan of his vehicle in April 2014, noting that Officer Keightley and Ace had been certified in January 2014, and that certifications are valid for six months. See id.

at 407, 158 A.3d at 1052. The Court of Special Appeals rejected Grimm's argument that the video of the dog scan showed that Ace did not alert, as the circuit court credited Sergeant Davis's testimony that Ace alerted. See id. at 407, 158 A.3d at 1052. The Court of Special Appeals was unpersuaded by Grimm's reliance on Cox's testimony that Ace had 44 false alerts in 179 training scenarios, as Sergeant Davis analyzed a different time period, found a much lower rate of false alerts, and "testified that there was no particular amount of false alerts that she would find unacceptable." Id. at 407, 158 A.3d at 1052.[8]

**Petition for Writ of *Certiorari* and Cross-Petition**

On June 15, 2017, Grimm filed a petition for a writ of *certiorari*, raising the following two issues:

> 1. When a defendant challenges the reliability of a drug-sniffing dog overall and the reliability of the dog's purported alert to the possible presence of drugs in a vehicle driven by the defendant, in accordance with [] *Harris*, 568 U.S. 237[], and the trial court rules that the dog's alert established probable cause to search the vehicle, what is the applicable standard of appellate review?
>
> 2. Whatever standard of appellate review applies, did the [circuit] court err in ruling that [law enforcement] had probable cause to search the [Honda that was] driven by [Grimm]?

On June 30, 2017, the State filed a conditional cross-petition for a writ of *certiorari*, raising the following issue: "Even if [law enforcement officers] did not possess probable cause to search Grimm's [Honda], should this Court decline to apply the Fourth Amendment's exclusionary rule because the [law enforcement officers] relied on Ace's [] alert in

---

[8]The Court of Special Appeals also held that the circuit court did not err in admitting evidence that, on August 19, 2014, Ace was recertified. See Grimm, 232 Md. App. at 410, 158 A.3d at 1054. That issue is not before us.

objective good faith?"  On September 12, 2017, this Court granted the petition and the conditional cross-petition.  See Grimm v. State, 456 Md. 54, 170 A.3d 290 (2017).

## DISCUSSION

## I.

### The Parties' Contentions

Grimm contends that the Court of Special Appeals erred in reviewing for clear error the circuit court's determination that Ace was reliable, and argues that the correct standard of review is *de novo*—*i.e.*, without deference.  Grimm asserts that the appellate court must review without deference the issue of whether a drug detection dog is reliable because an appellate court reviews without deference the issue of whether probable cause existed.  Grimm maintains that a trial court is not better positioned than an appellate court to determine whether a drug detection dog is reliable.  Grimm contends that the circuit court did not have an advantage in assessing the expert testimony because the experts' credibility turned not on the experts' demeanor, but rather on the plausibility and coherence of the experts' explanations of the relevant documents and the recording of the traffic stop.  Grimm argues that it would be inappropriate to defer to the circuit court's determination of the experts' credibility because the experts' opinions essentially constituted opinions as to whether probable cause existed.

Grimm maintains that, even if the circuit court had an advantage in weighing the evidence, to maintain control of the probable cause standard and satisfy the Fourth Amendment, an appellate court must still review without deference the circuit court's determination that Ace was reliable.  Grimm contends that, because there are no generally

accepted standards in Maryland regarding the training and certification of drug detection dogs, appellate courts must provide guidance to law enforcement agencies on the issue, and review without deference would provide the opportunity for such guidance. Grimm asserts that, if appellate courts review trial courts' reliability determinations for clear error, then a drug detection dog might be considered reliable in one county or one courtroom, but not another. Grimm maintains that, in Harris, 568 U.S. 237, the Supreme Court analyzed the issue of whether a drug detection dog was reliable in a manner that was consistent with review without deference.

The State responds that an appellate court reviews a determination of probable cause in the same manner in all warrantless search cases, regardless of whether a law enforcement officer or a drug detection dog detected an odor of controlled dangerous substances. The State contends that an appellate court reviews for clear error a trial court's findings of fact, and reviews without deference the ultimate question of whether probable cause existed. The State argues that the relevant finding of fact is whether a drug detection dog detected an odor of controlled dangerous substances. The State asserts that, just as an appellate court defers to a trial court's finding that a law enforcement officer was credible in testifying that he or she smelled marijuana emanating from a vehicle, an appellate court defers to a trial court's factual finding that a drug detection dog smelled drugs. The State maintains that the only difference in a case that involves a drug detection dog is that the State must prove that the drug detection dog smelled drugs through circumstantial evidence, such as the drug detection dog's training and performance in the field. The State argues that, in Harris, the Supreme Court applied the well-established standard of review

of a determination of probable cause, and did not apply a different standard of review because a drug detection dog, rather than a law enforcement officer, detected drugs.

**Law**

In Miller, 474 U.S. at 105, 110, the Supreme Court held that the issue of whether a confession was voluntary was a legal question, not a factual question that was entitled to the presumption of correctness that was afforded to State court factual findings under what was then 28 U.S.C. § 2254(d). The Supreme Court concluded that there was no support for the position that the enactment of what was then 28 U.S.C. § 2254(d) in 1966 altered the Court's prior cases holding that the issue of voluntariness is a legal question. See id. at 111. In Miller, id. at 106-07, while interviewing a defendant, a law enforcement officer made false statements and "stated that he did not consider [the defendant] to be a criminal because the perpetrator of the [murder] had a 'mental problem[,]' and needed medical help rather than punishment." The defendant confessed, and was convicted. See id. at 107-08. The defendant appealed, contending that his confession was involuntary. See id. at 108. A State supreme court determined that the defendant's confession was voluntary. See id.

Later, the defendant petitioned for a writ of habeas corpus. See id. The United States District Court for the District of New Jersey dismissed the petition, and the United States Court of Appeals for the Third Circuit affirmed, concluding that the District Court's dismissal of the petition was proper because the issue of whether a confession was voluntary was a factual question. See id. The Court of Appeals concluded that the habeas proceeding was governed by what was then 28 U.S.C. § 2254(d), which stated in pertinent part: "In any proceeding instituted in a Federal Court by an application for writ of habeas

corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction shall be presumed to be correct[.]" Id. at 108, 105 n.1.[9]

The Supreme Court reversed, explaining that its precedent established that "the ultimate issue of voluntariness is a legal question requiring independent federal determination." Id. at 109-10 (cleaned up). In other words, the Supreme Court "was not bound by a [S]tate-court voluntariness finding[,]" and had a "historic duty to make an independent evaluation of the record." Id. at 110 (cleaned up). The Court acknowledged that "subsidiary factual questions, such as whether a drug has the properties of a truth serum, or whether in fact [law enforcement officers] engaged in the intimidation tactics [that are] alleged by [a] defendant, are entitled to the [28 U.S.C.] § 2254(d) presumption." Id. at 112 (citations omitted). The Court, however, reiterated that "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." Id. at 112.

The Court observed that "the appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive." Id. at 113 (citations omitted). The Court distinguished factual questions from legal questions as follows:

> Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a "question of law," a "question of

---

[9]28 U.S.C. § 2254(d) is now codified at 28 U.S.C. § 2254(e)(1), which states, in pertinent part: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue [that is] made by a State court shall be presumed to be correct."

fact," or a "mixed question of law and fact" is sometimes as much a matter of allocation as it is of analysis. At least in those instances in which Congress has not spoken[,] and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, **as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.** Where, for example, as with proof of actual malice in First Amendment libel cases, the relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law. . . .

[By] contrast, other considerations often suggest the appropriateness of resolving close questions concerning the status of an issue as one of "law" or "fact" in favor of extending deference to the trial court. **When, for example, the issue involves the credibility of witnesses[,] and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight.**

Id. at 113-14 (emphasis added) (citations omitted). Significantly, the Court stated that "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." Id. at 113 (citation omitted).

In Ornelas v. United States, 517 U.S. 690, 691 (1996), the Supreme Court held that the ultimate questions of reasonable suspicion and probable cause are to be reviewed *de novo*. The Supreme Court stated that the "principal components" of the inquiry are a determination of the events leading up to the stop or search, and a determination of whether these "historical facts" viewed from the standpoint of an objectively reasonable officer give rise to reasonable suspicion or probable cause. Id. at 696. In Ornelas, id. at 691-92, a law enforcement officer observed a two-door General Motors vehicle with California license plates in the parking lot of a motel in Milwaukee. The vehicle "attracted [the officer]'s

attention . . . because older model, two-door General Motors [vehicle]s are a favorite [among] drug couriers [as] it is easy to hide things in them; and because California is a 'source State' for drugs." Id. at 692. The officer radioed a dispatcher, and learned that the vehicle's registered owner was one of the two defendants. See id. The officer also learned that, at 4 a.m., the other defendant, accompanied by another man, had checked into the hotel without a reservation. See id.

The officer and his partner contacted the Drug Enforcement Administration, and learned that, according to the Narcotics and Dangerous Drugs Information System, one of the defendants was a heroin dealer from California, while the other defendant was a cocaine dealer from Arizona. See id. The officers summoned a drug detection dog and his handler; however, no dog scan of the vehicle occurred. See id. The defendants left the motel and entered the vehicle. See id. One of the officers approached the vehicle, identified himself, and asked whether the defendants had any drugs or other contraband. See id. The defendants responded: "No." Id. The officer asked for, and received, the defendants' identification. See id. at 692-93. The officer asked for permission to search the vehicle, and the defendants consented. See id. at 693. Another officer—who had searched approximately 2,000 vehicles for drugs—searched the vehicle, and noticed that a panel above the passenger-side backseat armrest felt somewhat loose. See id. According to the officer, a screw in the doorjamb that was next to the panel was rusty, indicating that it had been removed at some point. See id. The officer dismantled the panel, and found cocaine inside. See id.

The defendants moved to suppress the cocaine, contending that the officers violated

the Fourth Amendment by detaining them in the motel's parking lot and searching the vehicle's panel without a warrant. See id. The government conceded that the officers initiated an investigatory stop when they approached the defendants. See id. A magistrate judge determined that the officers had reasonable suspicion to initiate the investigatory stop, but lacked probable cause to search the vehicle. See id. at 694. The United States District Court for the Eastern District of Wisconsin determined that the officers had both reasonable suspicion to initiate the investigatory stop and probable cause to search the vehicle, and concluded that "reasonable suspicion became probable cause when [the officer] found the loose panel." See id. The United States Court of Appeals for the Seventh Circuit concluded that it would reverse "the District Court's determinations of reasonable suspicion and probable cause . . . only upon a finding of 'clear error.'" Id. (cleaned up). The Court of Appeals reasoned that the District Court's determination of reasonable suspicion was not clearly erroneous, but remanded for a determination of whether the officer was credible in testifying about the panel. See id. at 695. On remand, the magistrate judge expressly found the officer's testimony credible, and the District Court again determined that probable cause existed. See id. The Court of Appeals affirmed, reasoning that the District Court's determination of probable cause was not clearly erroneous. See id.

Significantly, the Supreme Court reversed and remanded the case to the Court of Appeals with instructions to review the District Court's determinations of reasonable suspicion and probable cause without deference. See id. at 700. The Supreme Court distinguished factual questions from legal questions, in the context of determinations of probable cause and reasonable suspicion, as follows:

The principal components of a determination of reasonable suspicion or probable cause will be the events [that] occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable [law enforcement] officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: The historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the relevant statutory or constitutional standard, or[,] to put it another way, whether the rule of law[,] as applied to the established facts[,] is or is not violated.

Id. at 696-97 (cleaned up). The Supreme Court also discussed "background facts" as follows:

A trial [court] views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. For example, what may not amount to reasonable suspicion at a motel located alongside a transcontinental highway at the height of the summer tourist season may rise to that level in December in Milwaukee. That city is unlikely to have been an overnight stop selected at the last minute by a traveler coming from California to points east. The 85-mile width of Lake Michigan blocks any further eastward progress. And while the city's salubrious summer climate and seasonal attractions bring many tourists at that time of year, the same is not true in December. Milwaukee's average daily high temperature in that month is 31 degrees and its average daily low is 17 degrees; the percentage of possible sunshine is only 38 percent. It is a reasonable inference that a Californian stopping in Milwaukee in December is either there to transact business or to visit family or friends. The background facts, though rarely the subject of explicit findings, inform the [trial court]'s assessment of the historical facts.

Id. at 699.

The Supreme Court observed that it had never expressly deferred to a trial court's determination of reasonable suspicion or probable cause. See id. at 697. The Supreme Court stated that, "as a general matter[,] determinations of reasonable suspicion and

probable cause should be reviewed [without deference] on appeal." Id. at 699. The Supreme Court, however, "hasten[ed] to point out that a[n appellate] court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by [trial court]s and local law enforcement officers." Id. The Court directed that an appellate "court should give due weight to a trial court's finding that [an] officer was credible and [that] the inference was reasonable." Id. at 700.

In Harris, 568 U.S. at 250, the Supreme Court held that a law enforcement officer had probable cause to search a defendant's vehicle where "training records established [a drug detection dog]'s reliability in detecting drugs[,] and [the defendant] failed to undermine that showing[.]" Unlike in Ornelas, 517 U.S. at 691, in Harris, 568 U.S. 237, the Supreme Court was not required to address the applicable standard of review of a probable cause determination. Nor was the Supreme Court in Harris required to address whether the issue of a drug detection dog's reliability is a question of fact or law. In upholding the trial court's determination that a law enforcement officer had probable cause to search a defendant's truck, the Supreme Court explained that a law enforcement "officer has probable cause to conduct a search when the facts [that are] available to [the officer] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Id. at 243 (cleaned up). The Supreme Court stated that "evidence of a [drug detection] dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [or her] alert." Id. at 246.

In Harris, id. at 240, a law enforcement officer was on a patrol with a drug detection dog who had been trained to detect marijuana, cocaine, heroin, ecstasy and

methamphetamine. The officer initiated a traffic stop of the defendant's vehicle due to an expired license plate. See id. The officer observed that the defendant "was 'visibly nervous,' unable to sit still, shaking, and breathing rapidly." Id. The officer walked the drug detection dog around the defendant's vehicle, and the drug detection dog alerted to the driver's side door handle. See id. The officer searched the defendant's vehicle, and did not find any drugs; however, the officer found multiple ingredients for making methamphetamine, including pseudoephedrine pills. See id. at 240-41. The officer arrested the defendant, who admitted that he routinely made methamphetamine, and that he could not go for more than a few days without using methamphetamine. See id. at 241. After the defendant was released on bail, the officer initiated another traffic stop of the defendant's vehicle due to a broken brake light. See id. The drug detection dog performed another scan, and alerted to the driver's side door handle again; however, the officer did not find anything of interest while searching the defendant's vehicle. See id. The State of Florida charged the defendant with possession of pseudoephedrine for use in manufacturing methamphetamine. See id.

The defendant moved to suppress the evidence found in his vehicle, contending that the drug detection dog's alert did not provide the officer with probable cause to search the defendant's vehicle. See id. At the hearing on the motion to suppress, the officer testified that, approximately two years before the traffic stops in Harris, the officer and a different drug detection dog completed a 160-hour course in drug detection. See id. With a different officer, the drug detection dog in Harris completed a 120-hour course in drug detection, and the drug detection dog received a certification—valid for one year—from a company

- 42 -

that tested and certified drug detection dogs. See id. The following year, the drug detection dog and the officer became a team, and completed a 40-hour refresher course. See id. For four hours a week, the officer trained the drug detection dog by hiding drugs in certain vehicles or buildings, but not others, to determine whether the drug detection dog alerted to the drugs' locations. See id. The officer testified the drug detection dog's performance during training was "really good." Id. The drug detection dog's training records demonstrated that he always found hidden drugs, and that he performed satisfactorily on each day of training. See id. at 241-42. The officer testified that, although there were no drugs in the defendant's vehicle during either traffic stop, the drug detection dog alerted both times because the defendant had likely transferred a "residual odor" of methamphetamine to the driver's side door handle. See id. at 242.

While cross-examining the officer, the defendant's counsel did not challenge the officer's and the drug detection dog's training. See id. The officer acknowledged that the drug detection dog's certification had expired the year before the traffic stops, but noted that Florida law did not require drug detection dogs to be certified. See id. The officer acknowledged that he made field reports only when the drug detection dog's alert resulted in an arrest. See id.

The trial court denied the motion to suppress, determining that the officer had probable cause to search the defendant's truck. See id. The Florida First District Court of Appeal affirmed. See id. The Supreme Court of Florida reversed, reasoning that, when a drug detection dog alerts, "the fact that the [drug detection] dog has been trained and certified is simply not enough to establish probable cause." Id. (cleaned up). The Supreme

- 43 -

Court of Florida concluded that the State of Florida needed to produce

> the [drug detection] dog's training and certification records, an explanation of the meaning of the particular training and certification, field performance records (including any unverified alerts), and evidence concerning the experience and training of the officer handling the [drug detection] dog, as well as any other objective evidence known to the officer about the [drug detection] dog's reliability.

Id. at 242-43 (cleaned up).

The Supreme Court of the United States reversed, concluding that the Florida Court's requirement of a particular set of records was "inconsistent with the flexible, common[]sense standard of probable cause." Id. at 250, 240 (cleaned up). The Supreme Court determined that the Florida Court had "flouted th[e] established approach to determining probable cause" by "creat[ing] a strict evidentiary checklist, whose every item the State must tick off." Id. at 244 (footnote omitted). The Supreme Court critiqued the Florida Court's creation of a checklist as follows:

> Most prominently, an alert cannot establish probable cause under the Florida [C]ourt's decision unless the State introduces comprehensive documentation of the [drug detection] dog's prior "hits" and "misses" in the field. (One wonders how the [Florida C]ourt would apply its test to a rookie [drug detection] dog.) No matter how much other proof the State offers of the [drug detection] dog's reliability, the absent field performance records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis.

Id. at 244-45.

The Supreme Court explained that the Florida Court's reasoning was also flawed because that Court had "treat[ed] records of a [drug detection] dog's field performance as the gold standard in evidence, when[,] in most cases[,] they have relatively limited import." Id. at 245. The Supreme Court noted that field reports usually do not reflect a

drug detection dog's false negatives—*i.e.*, the drug detection dog's failure to alert where drugs are present—because, generally, a search does not ensue in such scenarios. See id. The Supreme Court observed that field reports "may markedly overstate a [drug detection] dog's" false alerts, given that, when a drug detection dog falsely alerts, the drug detection dog "may not have made a mistake at all" because the drug detection "dog may have detected substances that were too well[-]hidden[,] or present in quantities too small for [a law enforcement] officer to locate. Or the [drug detection] dog may have smelled the residual odor of drugs [that were] previously in the vehicle or on the driver's person." Id. at 245-46 (footnote omitted). The Supreme Court explained that, accordingly, in contrast to field reports, training records are "[t]he better measure of a [drug detection] dog's reliability" because they result from "controlled testing environments" in which it is known "where drugs are hidden and where they are not[.]" Id. at 246 (footnote omitted).

In this context, the Supreme Court stated that "evidence of a [drug detection] dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [or her] alert." Id. The Court provided examples of such evidence of a drug detection dog's satisfactory performance as follows:

> If a bona fide organization has certified a [drug detection] dog after testing his [or her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the [drug detection] dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the [drug detection] dog has recently and successfully completed a training program that evaluated his [or her] proficiency in locating drugs.

Id. at 246-47.

The Supreme Court added, however, that a defendant "must have an opportunity to

challenge such evidence of a [drug detection] dog's reliability, whether by cross-examining the testifying officer[,] or by introducing his [or her] own fact or expert witnesses." Id. at 247. The Supreme Court provided examples of ways in which a defendant may challenge a drug detection dog's reliability as follows:

> The defendant . . . may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the [drug detection] dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the [drug detection] dog's (or handler's) history in the field, although susceptible to . . . misinterpretation . . . , may sometimes be relevant[.] . . . And even assuming [that] a [drug detection] dog is generally reliable, [the] circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the [drug detection] dog (consciously or not), or if the team was working under unfamiliar conditions.

Id.

> In conclusion, the Supreme Court stated:

> **[A] probable[ ]cause hearing focusing on a [drug detection] dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a [drug detection] dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, [by] contrast, the defendant has challenged the State's case (by disputing the reliability of the [drug detection] dog overall or of a particular alert), then the court should weigh the competing evidence.** In all events, the court should not prescribe, as the [] Supreme Court [of Florida] did, an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a [drug detection] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test.

Id. at 247-48 (emphasis added).

Notably, in evaluating the case, the Supreme Court held that "**[t]he record in this case amply supported the trial court's determination that [the drug detection dog]'s alert gave [the officer] probable cause to search [the defendant]'s truck.**" Id. at 248 (emphasis added). Specifically, the Supreme Court observed that the State had produced "substantial evidence of [the drug detection dog]'s training and his proficiency in finding drugs." Id. And, the officer testified, and the drug detection dog's training "records confirmed, that [the drug detection dog] always performed at the highest level" during training. Id. The Supreme Court concluded that the drug detection dog's completion of two recent courses in drug detection, as well as his weekly training, "sufficed to establish [the drug detection dog]'s reliability"—"with or without the prior certification[.]" Id. at 249. As to the ultimate issue of probable cause, the Supreme Court concluded that the officer "had good cause to view [the drug detection dog] as a reliable detector of drugs. And no special circumstance here gave [the officer] reason to discount [the drug detection dog]'s usual dependability[,] or distrust his response to [the defendant]'s truck." Id. at 249-50.

The Supreme Court noted that the defendant had not challenged the drug detection dog's training in the trial court, and thus could not do so for the first time on appeal. See id. at 248-49. The Supreme Court concluded that the defendant's cross-examination of the officer, "which focused on [the drug detection dog]'s field performance, failed to rebut the State's case." Id. at 249. The Supreme Court was unpersuaded by the defendant's reliance in the trial court on the drug detection dog's false alerts during the traffic stops in Harris. See id. The Supreme Court reiterated that it was inappropriate to "infer[] too

- 47 -

much from" a false alert.  Id.  The Supreme Court further explained that the drug detection

dog's false alerts were likely due to odors that the defendant had transferred to the driver's

side door handle, as the defendant regularly made and used methamphetamine.  See id.

The Supreme Court stated: "A well-trained drug-detection dog *should* alert to such odors;

his [or her] response to them might appear a mistake, but in fact is not.  And still more

fundamentally, we do not evaluate probable cause in hindsight, based on what a search

does or does not turn up."  Id. (emphasis in original) (citations omitted).

**Analysis**

Here, we conclude that the ultimate question of probable cause to conduct a

warrantless search of a vehicle based on a drug detection dog's alert is reviewed *de novo*;

*i.e.*, the standard of review as to the issue of probable cause to search based on a drug

detection dog's alert is *de novo*.  A determination of probable cause involves a two-step

process.  First, a court must identify all of the relevant historical facts that were known to

the officer at the time of the search and, if necessary, any relevant or disputed background

facts.  Second, the court must determine whether those facts give rise to probable cause to

search.  We conclude that the issue of a drug detection dog's reliability is a factual question,

specifically, a question involving a background fact that falls somewhere between a clear

legal issue and a simple fact.  Accordingly, an appellate court reviews for clear error a trial

court's finding as whether a drug detection dog is, or is not, reliable.

We begin by discussing how to distinguish factual questions from legal questions.

Generally, where an issue falls between a pristine legal question and a factual matter, the

issue is treated as a factual question where a trial court "is better positioned than [an

appellate court] to decide the issue[.]" Miller, 474 U.S. at 114. And, an issue is a factual question where "the issue involves the credibility of witnesses[,] and therefore turns largely on an evaluation of demeanor[.]" Id. By contrast, generally, an issue is a legal question "where the relevant legal principle can be given meaning only through its application to the particular circumstances of a case[.]" Ornelas, 517 U.S. at 697 (quoting Miller, 474 U.S. at 114) (internal quotation marks omitted).

Even where an issue is a legal question, the issue may involve "subsidiary factual questions[.]" Miller, 474 U.S. at 112. For example, although the issue of whether a defendant's confession was voluntary is a legal question, the issue involves the following "subsidiary factual questions": the interrogation's "length and circumstances"; "the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings"; whether the defendant took a drug that had "the properties of a truth serum"; and whether law enforcement officers "engaged in [] intimidation tactics[.]" Id. at 110, 112, 117 (citations omitted). Similarly, although the issue of whether probable cause for a search exists is a legal question, the issue may involve both "historical facts" and "background facts[.]" Ornelas, 517 U.S. at 691, 700. Historical facts are the events that give rise to a case—*e.g.*, the fact that a car with California license plates was parked in the parking lot of a motel in Milwaukee. See id. at 691-92. Meanwhile, background facts include generally-known circumstances that may be relevant to a case—for example, the fact that a person who is traveling from California to points east is "unlikely" to choose to stay overnight in Milwaukee. Id. at 699. In describing background facts, the Supreme Court stated that "a police officer views the facts through the lens of his police experience

- 49 -

and expertise[,]" and "[t]he background facts provide a context for the historical facts[.]" Id.

Although the ultimate issue of whether probable cause existed is a legal question, resolution of the issue may involve the determination of factual questions. We are convinced that an issue as to a drug detection dog's reliability is one such factual question. Much like whether a law enforcement officer has the experience and expertise to detect the odor of a controlled dangerous substance, the issue of whether a drug detection dog is reliable, *i.e.*, has the requisite training and experience to be reliable, is a factual question. The actual detection of an odor of a controlled dangerous substance by a law enforcement officer and a drug detection dog's alert to the odor of a controlled dangerous substance in a vehicle are historical facts, *i.e.*, events that occur leading up to a warrantless search. By contrast, the experience and expertise of a law enforcement officer and the training and field performance by a drug detection dog are background facts, *i.e.*, general "facts [that] provide a context for the historical facts, and when seen together yield inferences that deserve deference." Ornelas, 517 U.S. at 699. A background fact may range from a circumstance that is generally known, such as the weather on a particular day, to a fact involving a law enforcement officer's knowledge based on his experience and expertise. A drug detection dog's alert and reliability are critical facts in the probable cause determination. As such, it cannot be said that, when disputed, a drug detection dog's reliability is a simple background fact. Rather, it is a background fact, the determination of which largely informs the determination of probable cause based on a drug detection dog's alert. Both historical and background facts, including those that fall between a clear

legal issue and simple fact, are reviewed for clear error.

Plainly, a trial court is better positioned than an appellate court to determine whether a drug detection dog is reliable.  This is because the issue of a drug detection dog's reliability requires a trial court to, among things, assess the credibility of witnesses; to review, where available, a recording of the drug detection dog's scan; to determine the weight to be given documentary evidence, such as the drug detection dog's training records, field reports, and certifications; to consider the qualifications of any experts, and assess their credibility and opinions about the evidence; and to determine whether, under the totality of the circumstances, the drug detection dog is reliable.

The circumstances of this case demonstrate that a trial court is better-equipped than an appellate court to determine a drug detection dog's reliability.  The circuit court admitted into evidence a recording of the traffic stop from the dashboard camera in Sergeant Lamb's vehicle.  With the recording, both the circuit court and the expert witnesses were able to view the entirety of Ace's scan of the Honda.  The recording was played during the testimony of both Sergeant Davis, one of the State's experts, and Cox, one of Grimm's experts.  Sergeant Davis and Cox pointed out and explained various events in the recording, such as the circumstance that Ace was barking before Officer Keightley commanded him to search.  Sergeant Davis testified that Ace's barking was simply a sign that he was "still a little bit excited[,]" and explained that Officer Keightley calmed Ace before commanding him to search.  By contrast, Cox opined that a dog barking excessively may cause a loss of energy and affect the dog's performance.  Although we have access to both the recording and a transcript of Sergeant Davis's and Cox's testimony, we lack the circuit court's ability

- 51 -

to view the recording simultaneously with Sergeant Davis and Cox, with them making observations about the recording while testifying.

The circuit court properly made determinations as to the expert witnesses' credibility. Just as the expert witnesses had conflicting interpretations of the events in the recording, so, too, did the expert witnesses have conflicting interpretations of other evidence. For example, the evidence showed that, on May 17, 2014—nearly a month after the traffic stop on April 19, 2014—pursuant to Officer McNerney's recommendation, Officer Keightley and Ace were decertified as a result of an issue with regard to the calculation of the number of Ace's training hours. As one of Grimm's experts, Officer McNerney testified that he recommended that Officer Keightley and Ace be decertified because, according to Ace's training records, he was not trained the sixteen hours a month that was required for certification. By contrast, Sergeant Davis testified that she would not have decertified Ace on that basis, as his "skills . . . were not affected one iota by the way" in which his training hours were calculated. Sergeant Davis testified that the issue with regard to how the number of hours of Ace's training was calculated did not affect Officer Keightley's and Ace's January 22, 2014 certification, explaining: "Either [Ace] knows the odors[,] or he does[ not]. And he can perform, or he cannot." The circuit court expressly found credible Sergeant Davis's opinion about the issue of calculating the number of hours of Ace's training, stating: "[W]hen I went over and examined everything and everything over and over and over again, I could not get this comment out of my mind. ['Ace] knows the odor[,] or he does[ not]. He can perform[,] or he can[not.']" Although the record includes, among other things, documentary evidence and a transcript of the expert

- 52 -

witnesses' testimony, we lack the circuit court's ability to consider the evidence with the benefit of observing the expert witnesses' demeanor and level of certainty while testifying.

The circuit court was better positioned to determine the expert witnesses' credibility and whether the expert witnesses displayed demeanors that were indicative of bias. Here, the circuit court expressly found Sergeant Davis "to be the most credible witness[,]" and found that she was "neutral and unbiased" and had "no ties to th[is] case[.]" By contrast, although the circuit court deemed Cox and Officer McNerney also credible, the circuit court found that they had "some bias"; that "there [was] dissension in the ranks"; and that, while testifying, Cox and Officer McNerney "air[ed] dirty laundry." In one instance, Officer McNerney testified that "it was tough" to train dogs in both explosive detection and drug detection, and that he "went to command and asked to make that a full-time position due to the fact that [he] was being detailed out[,]" but his request was denied. In a similar vein, Cox testified, with regard to the circumstance that the Maryland Transportation Authority Police K-9 Standard Operating Procedures did not require analysis of the purity of narcotic aids: "I wish [that] I could speak about the steps and measures that I took [] to try to clear this up, but I[ am] not allowed to[.]" Cox also testified at one point that he thought Officer Keightley was "basically, just like a rogue police." Because an appellate court can only read a transcript, rather than see and hear testimony firsthand, the appellate court lacks the circuit court's ability to assess the witness's attitude and demeanor, which may be indicative of bias and is relevant to a credibility determination.

Contrary to Grimm's assertions, a trial court may properly assess an expert witness's credibility, and make decisions based on its impression of an expert witness's credibility. In Smallwood v. State, 451 Md. 290, 309 n.15, 152 A.3d 776, 786 n.15 (2017), this Court rejected a defendant's contention that this Court should review a trial court's ruling on a petition for a writ of actual innocence under the *de novo* standard of review, as opposed to the abuse of discretion standard of review. This Court concluded that the correct standard of review was abuse of discretion because, "[u]nder well-established rules of appellate review, this Court is not a fact-finder, and we cannot set aside the [trial court]'s **credibility assessments** of [the defendant's psychiatric expert]'s and [the State's psychiatric expert]'s respective testimony." Id. at 309 n.15, 152 A.3d at 786 n.15 (emphasis added). Thus, in Smallwood, id. at 309 n.15, 152 A.3d at 786 n.15, this Court not only indicated that a trial court may assess an expert's credibility, but also determined that such a credibility assessment is entitled to deference.

Consistently, in various instances, this Court has referred to the "credibility" of expert witnesses. See, e.g., Falik v. Hornage, 413 Md. 163, 178, 991 A.2d 1234, 1243 (2010) ("Obviously, a party has a strong interest in the fact-finder's assessment of the credibility of its expert witnesses. . . . [T]he fact that an expert witness is being paid to testify may bear on his or her credibility and may be revealed through cross-examination." (Citations omitted)); McGhie v. State, 449 Md. 494, 512, 144 A.3d 752, 763 (2016) ("[W]hen an expert is called to testify, it is conceivable that, based on the cumulative body of evidence [that is] presented at a given trial, falsity regarding the expert's credibility and qualifications might create a substantial or significant possibility

that the result may have been different." (Cleaned up)); <u>Derr v. State</u>, 434 Md. 88, 134, 73 A.3d 254, 281 (2013) ("The [jury] instructions [that were] given sufficiently protected [the defendant]'s right to have the jury judge the credibility of all the evidence[,] including [the] testimony[ of an expert in forensic serology and forensic DNA analysis].").

In addition to the circuit court being in a superior position to determine Ace's reliability, our conclusion is supported by the Supreme Court's holding in <u>Harris</u>, 568 U.S. at 248-50, in which the Supreme Court essentially followed the two-step process for appellate review of the issue of probable cause set forth in <u>Ornelas</u>, 517 U.S. at 696-97, 699-700—namely, (1) identifying all of the relevant historical facts that were known to the officer at the time of the search, and (2) determining whether those facts give rise to probable cause to search. In <u>Harris</u>, <u>id.</u> at 249, the Supreme Court determined that the drug detection dog's completion of two recent courses in drug detection, and his weekly training, sufficed to establish the drug detection dog's reliability. Next, the Court determined that the officer "had good cause to view" the drug detection dog as reliable, and that there were no circumstances that gave the officer reason to discount the drug detection dog's reliability. <u>Id.</u> at 249-50. The Supreme Court determined the factual question of the drug detection dog's reliability, and then, under the totality of the circumstances, determined the issue of probable cause. <u>See</u> <u>id.</u>

Indeed, in <u>Harris</u>, <u>id.</u> at 248, the Supreme Court stated: "**The record in this case amply supported the trial court's determination** that [the drug detection dog]'s alert gave [the officer] probable cause to search [the defendant]'s truck." (Emphasis added). The Supreme Court's use of the language "[t]he record in this case amply supported the

trial court's determination" would have had no meaning if the Court were reviewing the trial court's reliability determination without deference. To the contrary, this language indicates that the Supreme Court viewed the trial court's reliability determination as a finding of fact, which would be upheld if it were supported by the record. See Cooper v. Harris, ___ U.S. ___, 137 S. Ct. 1455, 1465 (2017) ("[F]indings of fact . . . are subject to review only for clear error. . . . A finding that is plausible in light of the full record—even if another is equally or more so—must govern." (Cleaned up)). The language in the Supreme Court's holding in Harris, 568 U.S. at 248, is telling. The Supreme Court's language is consistent with the conclusion that the trial court's reliability determination was not a conclusion of law, but instead was a finding of fact—*i.e.*, a resolution of one of the factual questions involved in the issue of determining whether probable cause existed.

Our conclusion that a trial court's reliability determination is a finding of fact is supported not only by manner in which the Supreme Court phrased its holding in Harris, but also by the manner in which the Supreme Court reviewed the trial court's determinations. Instead of re-weighing the evidence or independently determining the credibility of the officer who handled the drug detection dog, the Supreme Court summarized the evidence of the drug detection dog's training and his proficiency in finding drugs. See id. at 248-49. The Supreme Court concluded that the drug detection dog's completion of two recent courses in drug detection, as well as his weekly training, "sufficed to establish [the drug detection dog]'s reliability." Id. at 249 (citation omitted). The Supreme Court stated that the defendant had not challenged the drug detection dog's training in the trial court, and determined that the defendant "failed to undermine" the

circumstance that the drug detection dog's training records established his reliability. Id. at 249-50. The Supreme Court explained that "evidence of a [drug detection] dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [or her] alert." Id. at 246. The Supreme Court specifically stated that, "[i]f a bona fide organization has certified a [drug detection] dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the [drug detection] dog's alert provides probable cause to search." Id. at 246-47. This analysis is a strong indication that the Supreme Court viewed the trial court's reliability determination as a factual determination, to be upheld as long as it was "plausible in light of the full record[.]" Cooper, 137 S. Ct. at 1465 (cleaned up).

It is also worth noting that, in critiquing the Florida Court's creation of "a strict evidentiary checklist," the Supreme Court stated that the Florida Court had done "the very thing" that the Supreme Court had "criticized in" Illinois v. Gates, 462 U.S. 213, 233 (1983), in which the Supreme Court "overhauled [its] method for assessing the trustworthiness of an informant's tip." Harris, 568 U.S. at 244-45. In Harris, id. at 245, the Supreme Court explained: "No more for [drug detection] dogs than for human informants is [] an inflexible checklist the way to prove reliability, and thus establish probable cause." Given that the Supreme Court warned against distinguishing drug detection dogs from "human informants" for purposes of establishing reliability, id., it makes sense to also avoid distinguishing drug detection dogs from humans, whether informants or law enforcement officers, for purposes of the standard of review. For example, where a law enforcement officer testified that he or she smelled an odor of

marijuana emanating from a vehicle, and a trial court determined that the officer's testimony was credible, the trial court's determination would obviously be a finding of fact, not a conclusion of law. Likewise, where a law enforcement officer receives information from an informant that gives rise to probable cause for a search, the issue of the informant's reliability would be a question of fact as opposed to an issue of law. Similarly, where a trial court determines that a drug detection dog is reliable, the trial court is essentially determining that the drug detection dog had the ability to accurately detect an odor of a controlled dangerous substance. It makes little sense to treat a trial court's reliability determination as a conclusion of law, rather than a finding of fact, because it was a drug detection dog, rather than a law enforcement officer, who detected the controlled dangerous substance.

For a myriad of reasons, the Supreme Court's holding in Harris informs our conclusion that a trial court's reliability determination is a finding of fact, and is subject to review for clear error. We are unpersuaded by Grimm's reliance on the circumstance that, in Harris, the Supreme Court did not expressly raise any issue as to the circumstance that the Supreme Court of Florida engaged in review without deference. In Harris v. State, 71 So. 3d 756, 765 (Fla.), as revised on denial of reh'g (Sept. 22, 2011), the Florida Court stated:

> [T]he question presented concerns the showing that the State must make to establish probable cause for a warrantless search of a vehicle based on a drug[] detection dog's alert to the vehicle. This issue involves a trial court's determination of the legal issue of probable cause, which we review de novo.

(Citations omitted). The first case that the Florida Court relied upon in support of this

proposition was <u>Ornelas</u>, 517 U.S. at 699.  Respectfully, <u>Ornelas</u>, <u>id.</u>, does not support the proposition that an appellate court reviews without deference a trial court's reliability determination.  To the contrary, as discussed above, the Supreme Court's holding in <u>Ornelas</u>, <u>id.</u> at 699-700, indicates that, although the issue of whether probable cause exists is a legal question, the issue may involve underlying factual questions regarding both historical and background facts.

It is of no consequence that, in <u>Harris</u>, the Supreme Court did not expressly refer to the standard of review that the Florida Court had employed.  There was no need for the Supreme Court to do so, as the standard of review that the Florida Court had employed was not the subject of the petition for writ of *certiorari*—*i.e.*, the standard of review was not the issue in the Supreme Court's review of the Florida Court's decision.  Rather, the issue was whether the Florida Court had erred in creating a strict evidentiary checklist, whose every item the State must tick off.  See <u>Harris</u>, 568 U.S. at 244.

We are unpersuaded by Grimm's argument that non-deferential review of a trial court's reliability determination is necessary for appellate courts to maintain control of the probable cause standard.  Our holding will not affect the well-established principle that an appellate court reviews without deference a trial court's probable cause determination.  See <u>Ornelas</u>, 517 U.S. at 691.  We simply hold that, within the probable cause analysis, the issue of whether a drug detection dog is reliable is a factual question.  After a trial court has made a reliability determination, the trial court—and, ultimately, an appellate court—must conclude, as a matter of law, under the totality of the circumstances, whether probable cause existed.

We reject Grimm's contention that deferring to a trial court's determination of an expert witness's "credibility" is inappropriate where, as here, that determination is likely to be dispositive of the issue of whether probable cause existed. "[A]n issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." Miller, 474 U.S. at 113 (citation omitted). The circumstance that an expert opinion may be dispositive does not furnish any basis for providing a defendant who failed to convince a trial court that a drug detection dog was unreliable with a second bite at the apple in an appellate court.

Grimm barks up the wrong tree in asserting that, because there are no generally accepted standards in Maryland regarding the training and certification of drug detection dogs, appellate courts must provide guidance to law enforcement agencies. The Fourth Amendment does not require such standards. Indeed, in Harris, 568 U.S. at 249, 242, the Supreme Court concluded that evidence of the drug detection dog's training "sufficed to establish [the drug detection dog]'s reliability[,]" even though the drug detection dog's certification expired the year before the traffic stop. Just as no constitutional provision requires set standards for the training and certification of drug detection dogs, no Maryland statute does, either.

We find no merit in Grimm's contention that, if appellate courts review trial courts' reliability determinations for clear error, a drug detection dog might be considered reliable in one county or one courtroom, but not another. Just as probable cause determinations are case-specific, so, too, are reliability determinations. See id. at 244, 247-48 ("In evaluating whether the State has met th[e] practical and common[sense] standard[ of probable cause],

- 60 -

we have consistently looked to the totality of the circumstances. . . . [T]he court should then evaluate the proffered evidence to decide what all the circumstances demonstrate.”). When the issue is contested, whether a trial court will find a drug detection dog reliable in a particular case depends not only on the drug detection dog's training records, but also on all of the other evidence in the case, such as expert testimony, which may vary from case-to-case concerning the same dog, lay witness testimony, a recording (when available), and a description of the circumstances of the drug detection dog's scan and alert.

In sum, we agree with the conclusion of the Court of Special Appeals that the question of whether a drug detection dog is reliable is a question of fact "best left to the [trial court that] hears the evidence, and [is] best reviewed under a 'clearly erroneous' standard that gives deference to [the trial court]'s superior opportunity to evaluate credibility and weigh the evidence." Grimm, 232 Md. App. at 403-04, 158 A.3d at 1050 (citations omitted).

## II.

### The Parties' Contentions

Grimm contends that, no matter which standard of review applies to the circuit court's reliability determination, the circuit court erred in determining that Sergeant Lamb had probable cause to search Grimm's vehicle. Grimm argues that, if the applicable standard of review is review for clear error, then the circuit court clearly erred in finding Sergeant Davis the most credible witness. Grimm asserts that the circuit court was wrong in finding that Sergeant Davis was not biased, as she certified Officer Keightley and Ace on August 19, 2014, and thus was invested in this case's outcome. Grimm maintains that

the circuit court's finding that there was "dissension in the ranks" as to Cox and Officer McNerney was in the context of the circuit court's finding that they were credible and "good and fair in their analysis."

Grimm contends that Ace did not meet the minimum of sixteen hours of monthly training that was required for certification, and points out that, nearly a month after the traffic stop, Officer Keightley and Ace were decertified as a result of the issue with regard to how the number of hours of Ace's training was calculated. Grimm argues that, because the issue of Ace's training hours predated the traffic stop, Officer Keightley and Ace were "not actually certified in any meaningful sense" when the traffic stop occurred. Grimm contends that Sergeant Davis's certification of Officer Keightley and Ace approximately four months after the traffic stop reveals little, if anything, about Ace's reliability at the time of the traffic stop. Grimm notes that, according to Cox, between April 15, 2013 and March 24, 2014, during Ace's training, he performed 179 scans, and falsely alerted 44 times—*i.e.*, 25% of the time. Grimm contends that the circumstances surrounding Ace's scan of the Honda showed that he was unreliable. Grimm observes that Ace alerted to the driver's door, even though the drugs were found near the passenger door. Grimm notes that, even though Ace would alert without being commanded to search, he did not alert when he walked by the open passenger-side window.

The State responds that the totality of the circumstances, including Ace's alert, established probable cause for the search. The State notes that the circuit court found that, in addition to Ace's alert, Sergeant Lamb considered the behavior of the Honda's occupants to be "indicia" that he was dealing with "a drug dealer[.]" The State contends that the

circuit court did not clearly err in finding Sergeant Davis to be the most credible witness concerning Ace's reliability. The State argues that, as a member of the Montgomery County Police Department's K-9 Unit, Sergeant Davis was "the only outside observer[,]" and was not subject to bias, as Cox and Officer McNerney were. The State asserts that Sergeant Davis was the only witness to have conducted a comprehensive review of all of Ace's training records from his initial training in 2012 to July 2014, and that she opined that Ace performed satisfactorily during his training.

The State points out that, in the field, Ace alerted 51 times, and falsely alerted 19 times, or 37% of the time; however, with regard to 10 of the 19 false alerts, one of the vehicle's occupants admitted that drugs had recently been in the vehicle. The State contends that, accordingly, in the field, Ace's percentage of false alerts was 18%, and his percentage of accuracy was 82%. The State observes that the circuit court found credible Sergeant Davis's opinion that Ace alerted on Grimm's vehicle, and that there was no evidence of a false alert.

**Analysis**

We hold that the circuit court did not clearly err in finding that Ace was reliable, and that the circuit court correctly concluded that Sergeant Lamb had probable cause to search Grimm's vehicle. In this case, the circuit court's assessment of the experts' credibility was critical to the circuit court's reliability determination. Indeed, the circuit court stated: "I[ am] not an expert. . . . I must rely upon the expert testimony"; "I cannot analyze this case without telling you who[m] I find to be the most credible witness." After finding Sergeant Davis "to be the most credible witness[,]" the circuit court "accept[ed]"

Sergeant Davis's opinion that Ace "was competent"—*i.e.*, reliable.  In reviewing the circuit court's reliability determination, we must ascertain whether the circuit court clearly erred.  We readily conclude that there was no such clear error.

"The appellate court views the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails on the issue that the defendant raises in the motion to suppress."  Varriale, 444 Md. at 410, 119 A.3d at 830 (citation omitted).  A trial court's finding of fact "is not clearly erroneous if the record shows that there is legally sufficient evidence to support it."  Kusi v. State, 438 Md. 362, 380, 91 A.3d 1192, 1202 (2014) (cleaned up).  And, an appellate court must "give due regard to the opportunity of the trial court to judge the credibility of the witnesses."  Md. R. 8-131(c).

Here, the circuit court's finding that Ace was reliable was not clearly erroneous.  To begin, the evidence substantiates the circuit court's finding that Sergeant Davis was the most credible expert witness.  Sergeant Davis's "qualifications, [] knowledge, [] training[,] and experience [were] impeccable[.]"  At the time of the hearing, Sergeant Davis had approximately seven or eight years of experience as a K-9 handler and approximately fifteen or sixteen years of experience as a K-9 trainer, including approximately seven years as the Montgomery County Police Department's K-9 Unit's head trainer.  During one of her years as a trainer, Sergeant Davis was one of the top twenty K-9 officers in the United States Police Canine Association's Patrol Dog Field Trials.  For approximately five years, Sergeant Davis answered questions about training dogs in Police K-9 Magazine.  Sergeant Davis had run events at the United States Police Canine Association's national training

seminar, and had given presentations at Police K-9 Magazine's conference. Sergeant Davis had managed a total of five K-9 teams, trained a total of sixty-five K-9 patrol teams, and trained a total of thirty-six K-9 detection teams.

The evidence substantiates the circuit court's finding that Sergeant Davis was "neutral and unbiased"; that she was "the best and most objective observer"; and that she "ha[d] no ties to th[is] case[.]" Sergeant Davis was not paid for her testimony, apart from what she was paid for being on duty while testifying. Sergeant Davis was the only expert witness who had never been a member of the Maryland Transportation Authority Police's K-9 Unit. As far as the record reveals, Sergeant Davis's only interaction with Officer Keightley and/or Ace occurred approximately four months after the dog scan in question. Specifically, on August 19, 2014, Sergeant Davis and two other members of the Montgomery County Police Department's K-9 Unit served as judges in the Maryland Transportation Authority Police's K-9 Unit's certification process, in which Officer Keightley and Ace were successful.

We reject Grimm's contention that Sergeant Davis was biased because she had previously certified Officer Keightley and Ace on August 19, 2014, after the dog scan in question. By certifying Officer Keightley and Ace, Sergeant Davis did not indicate that Ace had been reliable at all times prior to August 19, 2014; instead, Sergeant Davis simply determined that, on that particular date, Ace performed satisfactorily on the tests that were part of the certification process. Indeed, there is no evidence that Sergeant Davis reviewed any of Ace's training records or field reports on or before August 19, 2014. As far as the record reveals, Sergeant Davis did not know Officer Keightley or Ace or review Ace's

training records until she prepared for her testimony in this case, at which point she assessed, for the first time, whether Ace was reliable at the time of the dog scan on April 19, 2014.

The evidence of Sergeant Davis's credibility is even more pronounced upon comparing her circumstances to those of Grimm's experts, Cox and Officer McNerney. Despite labeling Cox and Officer McNerney credible,[10] the circuit court found that they had "some bias"; that "there [was] dissension in the ranks"; and that, while testifying, Cox and Officer McNerney "air[ed] dirty laundry."  An example of this is Cox's testimony that he wished that he could testify, but was not permitted to speak, about "the steps and measures that [he] took [] to try to clear [] up" the circumstance that the Maryland Transportation Authority Police K-9 Standard Operating Procedures did not require analysis of the purity of narcotic aids.  In the circuit court's words, Cox's view appeared to be that: "[T]hey did[ not] do it today as I did it then[.]"  It is also worth noting that Cox earned approximately between $4,000 and $5,000 working on this case, unlike Sergeant Davis, who was not paid, apart from what she was paid for being on duty while testifying. With regard to Officer McNerney, the circuit court stated that his position appeared to be

---

[10]At oral argument, in response to a question about what the circuit court meant when it found Cox and Officer McNerney credible while finding Sergeant Davis the most credible, the Assistant Attorney General responded that he thought that the circuit court did not believe that any of the witnesses were lying, and that the circuit court was "attempting to be polite" to Cox and Officer McNerney, who were "reputable" and "credentialed."  Consistently, the Court of Special Appeals referred to the circuit court's finding that Cox and Officer McNerney were credible as a "judicious exercise of courtroom courtesy[.]"  Grimm, 232 Md. App. at 404, 158 A.3d at 1050.  We agree with the State and the Court of Special Appeals on this matter.

that: "[Y]ou[ are] not listening to me." The record supports the circuit court's finding. Officer McNerney testified that command staff initially denied his request for his position to be made full-time, and that he stepped down as a trainer due to his concerns about the lack of training. Officer McNerney testified that, in the same month in which he was "was ordered back" to the K-9 Unit as a full-time trainer, he met with his superiors regarding training deficiencies within the K-9 Unit. Additionally, Officer Keightley and Ace were decertified pursuant to Officer McNerney's recommendation.

In addition to the findings with respect to Sergeant Davis's credibility and lack of bias, the record reflects that Sergeant Davis's qualifications were objectively superior to Cox's and Officer McNerney's. Cox had approximately three years of experience as a handler, and approximately twelve years of experience as a trainer. Officer McNerney had approximately three years of experience as a handler, and approximately five years of experience as a trainer. By contrast, Sergeant Davis had approximately seven or eight years of experience as a K-9 handler and approximately fifteen or sixteen years of experience as a K-9 trainer. Additionally, unlike Sergeant Davis, neither Cox nor Officer McNerney testified that he had participated in national training seminars and conferences, earned a distinction in a national police dog field trial, or been published in the field of training police dogs.

A drug detection dog's training records constitute the most probative evidence of his or her reliability. As the Supreme Court explained in Harris, 568 U.S. at 246, compared to a drug detection dog's field reports, his or her training records are "[t]he better measure of [his or her] reliability" because they result from "controlled testing environments."

(Footnote omitted). Consistent with the Supreme Court's holding in Harris, Sergeant Davis testified that Ace's field reports did not have "as much bearing" as his training records, because Ace's training took place in environments that were more controlled than those in the field.

In this case, Ace's training records alone constituted more than enough evidence to support the circuit court's reliability determination. The Supreme Court concluded in Harris, 568 U.S. at 249, that a sufficient amount of training alone can "suffice[] to establish [a drug detection dog]'s reliability." (Citation omitted). As to Ace's training records, the record reveals that, in testifying about Ace's alleged false alerts, Sergeant Davis and Cox referenced training records from different time periods. Specifically, Sergeant Davis testified about Ace's training records from 2013, in which Ace was in a total of 209 scenarios, and falsely alerted on only 24 occasions. In other words, in 2013, Ace falsely alerted approximately just 11% of the time. In contrast, Cox testified about Ace's training records from April 15, 2013 to March 24, 2014, during which Cox calculated that Ace was in a total of 179 scenarios, and falsely alerted on 44 occasions. In other words, under Cox's calculation, between April 15, 2013 and March 24, 2014, Ace falsely alerted approximately 25% of the time. We need not determine which of these two time periods was more indicative of Ace's reliability, as Sergeant Davis reviewed Ace's training records from his initial training in 2012 to July 2014, and testified that Officer Keightley and Ace performed satisfactorily during the course of training. Even if we considered Ace's percentage of false alerts of 25% during the time period that Cox referenced, that percentage is not dispositive in light of Sergeant Davis's opinion that she did not consider

any "particular amount" of false alerts to be "acceptable or unacceptable." Moreover, as Sergeant Davis pointed out that there is no industry standard with regard to an unacceptable number of false alerts; and, as Cox acknowledged, there are no State-wide requirements for drug detection dogs.

Grimm fails to effectively undermine the circuit court's reliability finding by pointing to alleged flaws in Ace's training. The bottom line is that the circuit court considered all of the evidence, including the expert witness testimony, and found the most credible witness to be Sergeant Davis—who opined that Ace was competent, and that he performed satisfactorily during training. Although the evidence of Ace's training alone supports the circuit court's reliability finding, we observe that Officer Keightley's and Ace's certifications provide even more support for that finding. As the Supreme Court explained in Harris, 568 U.S. at 246-47, "[i]f a bona fide organization has certified a [drug detection] dog after testing his [or her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the [drug detection] dog's alert provides probable cause to search." Here, Officer Keightley and Ace were certified four times before the dog scan in question, and twice afterward. At the time of the dog scan on April 19, 2014, Officer McNerney had most recently certified Officer Keightley and Ace on January 22, 2014. That certification was valid for six months, and thus was valid at the time of the dog scan, as Officer McNerney acknowledged. And, even though Officer McNerney caused Officer Keightley and Ace to be decertified approximately one month after the dog scan, Officer McNerney recertified Officer Keightley and Ace just two days later.

We acknowledge that a drug detection dog's field reports, "in most cases[,] have relatively limited import." Id. at 245. For what it is worth, however, we observe that, according to Ace's field reports, between July 6, 2012 and April 19, 2014, Ace alerted to vehicles 51 times. Of those 51 occasions, no drugs were found in the vehicle 19 times. That said, with regard to 10 of the 19 alerts to vehicles, one of the vehicle's occupants admitted that drugs had recently been in the vehicle. As the Supreme Court stated in Harris, a drug detection dog's percentage of false alerts in the field may be "markedly overstate[d]" due to the circumstance that "[t]he [drug detection] dog may have detected substances that were too well[-]hidden[,] or present in quantities [that were] too small for [a law enforcement] officer to locate. Or the [drug detection] dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person." Id. at 245-46 (footnote omitted). The whole of the evidence, including Ace's training records and field performance, established that Ace was reliable. For all of the above reasons, the circuit court's reliability determination was not clearly erroneous, and, upon *de novo* review, under the totality of the circumstances, Sergeant Lamb had probable cause to search Grimm's vehicle.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

Circuit Court for Anne Arundel County
Case No.: 02-K-14-001188
Argued: February 1, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 37

September Term, 2017

BRIAN GRIMM

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Concurring Opinion by Adkins, J.

Filed: April 20, 2018

Most respectfully, I write separately because while I concur that Ace was reliable, and probable cause was satisfied here, I reach a different conclusion regarding the appropriate standard of review for a drug-detecting dog's reliability. The Majority explains that while probable cause to search a vehicle based on a drug dog's alert is reviewed without deference, the question of whether the dog is reliable is one of fact and should therefore be reviewed for clear error. Maj. Slip Op. at 48. I disagree. *Florida v. Harris*, 568 U.S. 237, 247–48 (2013), has established that determining whether a dog is reliable requires an analysis of the totality of the circumstances, which this Court has always reviewed as a question of law. *State v. Wallace*, 372 Md. 137, 144 (2002). Therefore, a trial court's assessment of reliability should be reviewed without deference.

A law enforcement officer may search a vehicle without a warrant if the officer has probable cause. *See Robinson v. State*, 451 Md. 94, 108–109 (2017). Probable cause exists where, based on the available facts, a person of reasonable caution would believe that "contraband or evidence of a crime is present." *Harris*, 568 U.S. at 243. It is a "nontechnical common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge." *Wallace*, 372 Md. at 148. When a "properly trained canine alerts to a vehicle indicating the likelihood of contraband, sufficient probable cause exists to conduct a warrantless '*Carroll* [*v. United States*, 267 U.S. 132 (1925)]' search of the vehicle." *Id.* at 146.

In *Harris*, 568 U.S. at 240, the Supreme Court addressed how a court should decide if a dog's alert provides probable cause to search a vehicle. The Florida Supreme Court had held that to demonstrate whether a drug-detection dog is reliable, the State had to

satisfy a list of specific evidence showing the dog's reliability. *Id.* at 242–43. The Court reversed, reiterating that evaluating whether the State has satisfied probable cause depends on the totality of the circumstances, and a checklist approach "flouted this established approach to determining probable cause." *Id.* at 244.

The Court drew parallels between *Harris* and *Illinois v. Gates*, 462 U.S. 213 (1983). In *Gates*, *id.* at 233, the Court concluded that an informant's veracity, historical reliability, and basis of knowledge are all "relevant considerations" in a totality of the circumstances analysis to determine the "overall reliability of a tip." A deficiency in one area may be compensated for by a strong showing of other areas proving general reliability. *Id.* *Harris* imported this analysis, explaining that "[n]o more for dogs than for human informants is such an inflexible checklist the way to **prove reliability, and thus establish probable cause**." 568 U.S. at 245 (emphasis added).

The Court established a procedure for suppression hearings addressing whether a dog's alert provided probable cause. If the dog has been certified by a "bona fide organization" after his reliability has been tested in a controlled setting, then a court may presume that the alert provides probable cause. *Id.* at 246–47. Even if the dog is not formally certified, if it has "recently and successfully completed a training program that evaluated his proficiency in locating drugs," then the same presumption exists. *Id.* at 247. A defendant must have a chance to challenge this evidence of reliability, and the Court posited various avenues a defendant may use to refute that evidence. This procedure contemplated a totality of the circumstances analysis to find that a dog is reliable. "Even assuming a dog is generally reliable," the Court cautioned, "**circumstances surrounding**

2

**a particular alert may undermine the case for probable cause**—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* (emphasis added).

In summarizing this procedure, the Court laid out the appropriate analysis and test:

> In short, **a probable-cause hearing focusing on a dog's alert should proceed much like any other**. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. **And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate**. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, as the Florida Supreme Court did, an inflexible set of evidentiary requirements. **The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test**.

*Id.* at 247–48 (emphasis added).

The Majority makes much of the Supreme Court's pronouncement that "[t]he record in this case amply supported the trial court's determination that [the drug detection dog]'s alert gave [the officer] probable cause to search Harris's truck." *Id.* at 248; *see also* Maj. Slip Op. at 55–56. The Majority insists that this language "would have had no meaning if the Court were reviewing the trial court's reliability determination without deference." Maj. Slip Op. at 56. I disagree with this interpretation. A totality of the circumstances

3

analysis necessarily considers the record and defers to findings of fact while applying those facts to the law. *See Varriale v. State*, 444 Md. 400, 410 (2015).

Under the totality of the circumstances in *Harris*, it was reasonable to conclude that the dog was reliable. Florida had shown "substantial evidence" of the dog's training, past certification, and regular practice, the totality of which demonstrated that the dog was reliable. By contrast, Harris had not challenged the dog's training before the suppression court and had only cross-examined the officer about the dog's field record. *Harris*, 568 U.S. at 248–49. There were no circumstances that would suggest that the officer could not trust the dog's alert. *Id.* at 249–50. The totality of the circumstances in the record before the Court demonstrated that the dog was sufficiently reliable to support probable cause. *Id.* at 250.

Other jurisdictions have reached the conclusion that the "totality of the circumstances" analysis is most appropriate for determining whether a dog is reliable. Two years before the Supreme Court decided *Harris*, the Supreme Court of Oregon considered the appropriate standard for assessing a drug-detecting dog's reliability in *State v. Foster*, 252 P.3d 292 (Or. 2011). It held that "an alert by a properly trained and reliable drug dog can provide probable cause to search." *Id.* at 301. In language like that used by the Supreme Court in *Harris*, the Court explained:

> Whether in any particular case an alert provides probable cause requires an individualized inquiry, one that will depend on the totality of the information available to the officers. In the usual case, that information likely will include the dog-handler team's training, certification, and performance. But it can also include any other information relevant to the dog's reliability or fallibility.

4

*Id.* "Based on the totality of the circumstances bearing on [the dog's] particular reliability in this case" the Court decided that there was probable cause to search the defendant's car. *Id.* at 302. *See also State v. Helzer*, 252 P.3d 288, 289 (Or. 2011).

Following *Harris*, both the Fourth and Seventh Circuits have applied a "totality of the circumstances" test to assessing canine reliability on review. In *United States v. Green*, 740 F.3d 275, 281–82 (4th Cir. 2014), the Fourth Circuit applied *Harris* to decide whether a dog's record was sufficiently reliable to provide probable cause to search a vehicle. The State had presented substantial factual evidence about the dog's abilities to meet the presumption of reliability, and the defendant had not offered any evidence that undermined the showing. *Id.* at 283. The Fourth Circuit affirmed the district court's determination, concluding that based on the dog's "field performance records in conjunction with his degree of training, his performance during training and recertification exercises, and his evaluations by [State Troopers], the totality of the circumstances establish [the dog's] reliability in detecting drugs." *Id.* at 283–84.

In *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015), the Seventh Circuit considered whether Bentley had shown that a drug-detecting dog was not adequately trained or reliable. It reasoned that *Harris* required a suppression court to hold a probable cause hearing to assess whether a dog's training was adequate, a procedure that the lower court had "dutifully followed." *Id.* at 635–36. The hearing judge heard testimony about the dog's performance, "weighed all the evidence, decided to credit the government's experts over Bentley's, and decided that [the dog's] alert was reliable enough to support

5

probable cause." *Id.* at 636. The Seventh Circuit considered the evidence presented below adding to or detracting from the dog's reliability, and concluded that while the dog's record was problematic, it was sufficient for probable cause. Thus, the lower court did not err in finding the dog to be reliable based on "his training records, his 59.5% field rate, and [the] C[anine] T[raining] I[nstitute]'s curriculum." *Id.* at 637. While the dog's "mixed record" was less than ideal, "under *Harris*'s totality-of-the-circumstances test" there was no reason to reverse the lower court. *Id.* Although the Seventh Circuit acknowledged that a lower court's choice between "version[s] of the evidence" is entitled to deference, it accorded that deference to the hearing judge's assessment of various witnesses' explanations and credibility. *Id.* at 636.

Other jurisdictions have followed a similar approach, treating the *Harris* analysis of reliability as one that considers the totality of the circumstances.[1] *See, e.g.*, *United States v. Foreste*, 780 F.3d 518, 527–28 (2d Cir. 2015); *United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014); *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014); *United States v. Brown*, 179 F. Supp. 3d 595, 603 (E.D. Va. 2016); *Bennett v. State*, 111 So. 3d

---

[1] At least two jurisdictions have taken the position that reliability is a question of fact. In *Jackson v. State*, 427 S.W.3d 607, 615 (Ark. 2013), the Supreme Court of Arkansas concluded that a trial court's ruling that a dog was reliable was not "clearly erroneous." Likewise, in *People v. Caballes*, 851 N.E.2d 26, 31 (Ill. 2006), the Illinois Supreme Court explained that the determination that the police dog was "well trained and sufficiently reliable" was a factual one, subject to clear error review. *Caballes*, however, came some years before *Florida v. Harris*, 538 U.S. 237 (2013). And *Jackson*, although acknowledging *Harris*, did not fully consider the analysis established by that case. 427 S.W.3d at 615. Special Justice Gregory Jones concurred in judgment, providing a more nuanced analysis of the of the test set forth in *Harris*, an analysis that bore greater resemblance to a probable cause determination based on the totality of the circumstances, rather than a purely factual one. *Id.* at 625–26 (Gregory, J., concurring).

983, 985–86 (Fla. App. 2013); *see also Phippen v. State*, 297 P.3d 104, 109 (Wyo. 2013); *McKinney v. State*, 755 S.E.2d 315, 318 (Ga. App. 2014).

The Majority reasons that a trial court is "better positioned" than an appellate court to decide reliability. Maj. Slip Op. at 51. But the kind of evidence the Majority cites— training records, field records, videos of the scan, expert qualifications, and factual testimony—are materials this Court regularly considers in appellate review. This Court can review these materials while according the appropriate deference to a hearing judge's assessment of witness credibility when determining whether a lower court correctly applied the law. An expert witness's credibility in assessing and explaining evidence relating to canine training and behavior does not automatically correlate to a dog's reliability, particularly when other circumstances indicate the dog's performance may have been unreliable during a stop.

According to *Harris*, a court must consider all the circumstances surrounding the dog's alert—training, certification, reliable performance—and decide whether, under the totality of those circumstances, a dog's alert is reliable. 568 U.S. at 247–48. Whether a dog **alerted** is undoubtedly a question of fact, particularly if the alert appears ambiguous. *See, e.g.*, *Phippen*, 297 P.3d at 109 (lower court resolved conflicting testimony and concluded that dog alerted); *McKinney*, 755 S.E.2d at 318. But the alert itself is meaningless unless the alert is reliable. An alert does not establish probable cause without reliability. And reliability necessitates consideration of the circumstances of dog's training, certification, history, and experience—or lack thereof.

7

The hearing judge found that Ace completed an initial training course, continued training with his handler regularly, and was certified at the time that he detected the drugs in Grimm's vehicle. While Ace had some false alerts, his error rate was not so high that he was obviously unreliable. The hearing judge found Sergeant Davis's testimony explaining Ace's training and reliability to be more credible, and we should defer to that credibility assessment. Grimm offered evidence that undermined Ace's reliability. Weighing all the facts surrounding Ace's alert—his training, certification, and experience, viewed "through the lens of common sense" it is reasonable to find that when he alerted, a reasonable officer would believe that Ace was reliable and therefore "a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. 247–48. Under the totality of the circumstances test set forth in *Harris*, *id.*, I conclude that Ace was sufficiently reliable, and therefore probable cause was met.

The lack of generally accepted standards in Maryland for training and assessing drug detection dogs is troubling. I agree with the Majority that this Court should not wade into the fray by creating our own standards. Maj. Slip Op. at 60. That is a matter best left to the Legislature, rather than an appellate court.

As Chief Judge Wood observed in *Bentley*, 795 F.3d at 637, "[w]e hope and trust that the criminal justice establishment will work to improve the quality of training and the reliability of the animals they use . . . ." I have no doubt that Maryland officers work hard to train their canine companions to be accurate and reliable. But this Court should not abdicate its responsibility to make an independent review of probable cause, which in this case, relied entirely on a canine alert. *See Wallace*, 372 Md. at 144 (court makes an

8

independent constitutional evaluation of probable cause when a party challenges a search or seizure).